[Crim. No. 1988. In Bank.—December 28, 1917.]

## In the Matter of the Disbarment of BARCLAY McCOWAN.

ATTORNEY AT LAW—UNPROFESSIONAL CONDUCT—SUSPENSION.—The conduct of an attorney, who is also district attorney, and who, in that capacity, while not seeking any pecuniary advantage for himself, was guilty of serious improprieties and in addition used abusive and offensive language regarding the judge of the superior court, constitutes acts in violation of his duties, as defined in subdivisions 1 and 2 of section 282 of the Code of Civil Procedure, and such acts are too grave to justify a court in dismissing the accusation without imposing substantial punishment.

ID.—QUASI-CRIMINAL ACTION.—Proceedings for the disbarment of an attorney are quasi-criminal, and, in fixing the penalty to be imposed the court should take into account the motives and purposes which actuated the accused, and in the instant case a penalty of suspension from practice for one year is deemed sufficient.

PROCEEDINGS for disbarment of an attorney at law.

Kern County Bar Association, Accusant.

C. V. Anderson, C. L. Claflin, Geo. E. Whitaker, F. E. Borton, C. E. Arnold, and John S. Partridge, for Bar Association.

Barclay McCowan, *in pro. per.*, Francis J. Heney, Marshall Stimson, and Alfred Siemon, for Respondent.

SLOSS, J.—This is a disbarment proceeding which was heard by the district court of appeal for the second appellate district. In the course of a trial consuming several days, a great mass of testimony was presented to that court, which thereafter rendered its judgment denying the relief prayed for in the accusation. On the application of the Kern County Bar Association, which had preferred the charges, the proceeding was transferred to this court. A preliminary objection to our jurisdiction was overruled (*In re McCowan,* 175 Cal. 51, [170 Pac. 1100]), and the matter was brought on for hearing on its merits. Both parties agreed to submit the proceeding upon the testimony introduced before the district court of appeal.

The opinion filed by that court reads as follows:

"An accusation filed in the supreme court and later transferred to this court for hearing, charged the respondent with having been guilty of acts and conduct which were not only in violation of his duty as an attorney at law, but also such as involved moral turpitude on his part while holding the office of district attorney of the county of Kern. The accusation first charged that respondent solicited money from the defendant in a criminal case pending in the superior court, which money was to be paid in consideration that the official conduct of the respondent as district attorney should be influenced thereby. It is further charged that when the matter of the alleged misconduct of respondent was brought to the attention of the grand jury and while the matter was under investigation, respondent attempted to intimidate, coerce, and control the members of the grand jury with reference to the action that they should take therein; that he charged that one of the jurors had been indicted for a felony in the state of New Mexico and was not a fit or proper person to sit on the jury, notwithstanding that respondent knew

that the juror referred to had been acquitted of the charge in New Mexico; that he attempted to influence others of the jurors by statements designed to intimidate them; that he stated to the foreman of the grand jury that four of the jury members were in a conspiracy to deprive him of his office; that that conspiracy was made with one of the judges of the superior court. That during the time that charges against him were being investigated, the respondent insisted upon being present in person or by deputy before the grand jury, and that he or his deputy caused to be prepared certain reports which it was urged that the grand jury should adopt in exoneration of respondent, and that as a result of the intimidation and coercion a report of the jury was finally made as prepared by the deputy of respondent. Another of the charges made, in its specifications alleged that while the grand jury was investigating the McCowan matter, respondent stated and charged that one of the judges of the superior court was 'nothing but a crook'; that at a later date respondent caused to be published and circulated a certain paper called the 'Kern County Liberator,' which was owned and published by the said respondent, and which paper in the issue of July 31, 1915, contained slanderous references to the judge of the superior court and his action in the matter of the case of *People* v. *E. W. McCutchen,* which was the case wherein respondent was accused of having solicited money. The particular details of these charges were fully set out in the accusation, to which an answer was filed raising issue by denial as to any improper act having been committed in connection with the McCutchen case, and setting forth various statements by way of claimed justification as the same appear more particularly illustrated by the testimony of respondent which is hereinafter in general substance set out.

''Preliminarily, the following facts may be stated as to which there was no dispute either in the pleadings or testimony: In August, 1914, one E. W. McCutchen was indicted by the grand jury of Kern County for the crime of rape alleged to have been committed with a girl named Effie Thompson, who was at that time about the age of fifteen years; that the said McCutchen left the state of California and remained away from the state about six or seven months; that his whereabouts were unknown to the district attorney; that he returned to Bakersfield about the 20th of April, 1915; that

both he, his brothers, and wife had several conferences with respondent as district attorney; that McCutchen was released on bail acceptable to the district attorney; that before McCutchen made any appearance in court for arraignment or other proceedings on the indictment, the father of Effie Thompson brought a civil action as guardian *ad litem* for the girl, claiming a large amount of damages alleged to have been suffered by reason of the criminal act of the said McCutchen; that respondent consulted with the attorneys in the civil action with the end in view that they should abandon that cause; that the defendant McCutchen made his appearance in the criminal action and that thereafter copies of certain affidavits were presented to the judge of the superior court, in which it was charged on behalf of the McCutchens that the respondent had solicited money from them as a condition to favorable action being taken in the McCutchen case; that the grand jury proceeded to investigate the matter; that during the investigation the deputy of respondent insisted that it was the right of the district attorney to be present at the hearing, and that such deputy did remain during all of the time that testimony was being taken; that thereafter a new indictment was presented against McCutchen for the same charge and that after two trials had resulted in a disagreement of the juries, defendant on his third trial was acquitted.

"The foregoing matters, as mentioned, were among the facts about which there was no dispute. It may be added that there was no denial made by the respondent as to the statement attributed to him as having been uttered against the judge of the superior court. In support of the accusation, the testimony of J. B. McCutchen, a brother of E. W. McCutchen, was in substance as follows: That some time in the spring of 1915 he had a conversation with respondent, the district attorney of Kern County, when respondent asked him if he knew where his brother E. W. McCutchen was; that upon his replying that he did not know of his whereabouts, respondent had said that E. W. McCutchen was a good man, a friend of his and ought to be there, as it was his place and home, and that if he did return he would make it as easy for him as he could; that the witness had told the wife of E. W. McCutchen of this conversation; that at a later time, in an interview had with the district attorney, the latter had said that he needed money and that the McCutchen

brothers would all have to 'dig up'; that he wanted money from them.    The testimony of at least one other brother of McCutchen was corroborative of this testimony, and all suggesting directly the inference that the respondent proposed to assist E. W. McCutchen to escape punishment for the crime with which he was charged in consideration that money should be paid for the service.

"Mrs. Kate McCutchen, wife of E. W. McCutchen, testified that about the 1st of April, 1915, she telephoned to the district attorney and arranged for an appointment with him at 3 o'clock on the following day; that when she called at his office at the appointed time he said he was glad to see her and asked what the trouble was; that she replied that she had come to see about her husband, because after what J. B. McCutchen had told her, she thought the district attorney would befriend her husband and help him get out of the 'blackmailing business'; that Mr. McCowan replied that he had 'tried to give J. B. the hint, but that he didn't take it'; that he said he was a friend of the witness' husband and would do all he could for him; that the witness asked him how he would do that and he replied that there were various ways; that he told her she need not tell him about the 'rotten bunch' that her husband had gotten into; that he knew all about them, and was going to help him get out of it; that he then asked where the husband was and the witness had told him that she did not know; that along about the 20th of April the accused McCutchen returned to Bakersfield and the witness called up McCowan on the phone; that he told her to come to the office at 3 o'clock, which she did; that she there told him that Ed, her husband, was at home, and he said, 'I am awfully glad,' and seemed overjoyed with the news; that he then said, 'I am going to fix this all up for him as soon as I can; you people must be patient; this is a serious matter and it is going to take a little time; you go home and tell Ed to lay low until you hear further from me'; that the next day he called up the witness on the phone and had some conversation and told her she would hear from him again; that he called up the next day and told her to get her husband's brothers in to go on her husband's bond; that a few weeks later, while she was in the country, Mr. McCowan called her on the phone and said, 'Don't you know your good friend Barclay McCowan?   I have good news for you.    I can settle

that suit for five hundred dollars'; that he told her to tell Ed to trust him and that everything would be fixed up; that she knew at that time the civil suit had been filed on behalf of the Thompson girl against her husband.

"A. A. de Ligne, a witness called on behalf of petitioner, testified that on or about the nineteenth day of June, 1915, he had a conversation with Barclay McCowan in which reference was made to Judge Farmer; that the conversation took place in a restaurant on the main street of Bakersfield, 'the French Restaurant, I think they call it'; that he was sitting at one of the tables alone and that Mr. McCowan and Mr. Farraher came over to his table after they had finished their luncheon; that Mr. McCowan introduced Mr. Farraher to him, and that Mr. McCowan stated to Mr. Farraher, 'I have been telling de Ligne what a crook his friend Judge Farmer is'; that he resented the statement made by McCowan and that there was a little altercation about it.

"The accused, Barclay McCowan, testifying in his own behalf, denied that he had ever offered or suggested that money should be paid to him for services in the McCutchen case or as a condition to his favorable action in that matter as district attorney. He testified that Mrs. McCutchen had come to him and told him that she had taken the child in the matter and wanted to keep it and wanted to get her husband back to help raise it; that he had replied, 'If Ed will come back here and adopt this child and will provide for Effie Thompson and will plead guilty, I will do anything I can legally do to get him probation'; that about two weeks after that time Mrs. McCutchen came to his office again and gave him to understand, not in direct words, that her husband had come home; that he had instructed her to have McCutchen come to his office and arrange to give bond; that the next day that proceeding was carried out; that following that he had a conversation in a down-town office with E. W. McCutchen regarding the charge against the latter; that upon that occasion McCutchen had made a complete disclosure of his relations with the Thompson girl; that McCutchen had said, 'I will do anything you say,' and that he (McCowan) had replied, 'All right; you plead guilty, adopt the child and provide for the girl'; that very soon after this John W. Thompson, the father of Effie Thompson, commenced a civil action against McCutchen for a large amount of damages

on behalf of Effie Thompson; that he (McCowan) was irritated because this suit had been brought, and that he told McCutchen he would go to the firm of attorneys appearing in the action and talk over the matter and see what he could do toward getting the suit dismissed; that he did go to these attorneys and 'told them of the terms on which I had got McCutchen to come back to Kern County; I told them that he was out of the state and they could not find him, that two sheriffs had failed to find him; that he had come back on the understanding that he was to adopt the child, that he was to provide for the girl and that he would plead guilty'; that the attorneys agreed they would dismiss the suit if security was given for the provision to be made for the girl. The witness testified: 'It was suggested, I believe, that the girl be put in Notre Dame convent until she was twenty-one years old, and receive a reasonable sum of money at that time. I said, "Suppose the four brothers will sign an agreement to this effect." Foster said, "All right." ' That an understanding was arrived at in accordance with the suggestions he had made, but that McCutchen did not at any time provide or carry out what he had agreed to do respecting the making of provision for the girl; that McCutchen continually said that he had no money, and that McCowan told him that he must get money, saying, 'You have promised to take care of this girl and you must get some money; the court must be a party to the making of whatever agreement we make, and it cannot be made unless the court does approve of it; and if you apply for probation you must show the court you are worthy of it, and if you are not worthy of it the court will not accord it to you'; that McCutchen had said he would see what he could do, and later came back and said he could raise a thousand dollars; that he (McCowan) had replied, 'You better find you can raise another thousand; you seem to be imposing upon my friendship, upon my kindness; if you had been thrown into jail when you came back here, as the ordinary course would be, perhaps you would realize the seriousness of your position'; that he (McCowan) obtained an extension of time within which an answer might be filed in the civil action, but that McCutchen made an appearance in that action and employed certain attorneys with whom the witness stated he was not willing to have negotiations; that one of the McCutchen brothers had offered to give him a hundred

dollars, which he had refused, and had said, 'Ed McCutchen could not give me a million dollars'; that after McCutchen employed attorneys no further negotiations looking toward securing for him a probationary sentence were had; that the matter was taken before the grand jury for the purpose of having a new indictment returned because of a defect in the proceedings of a previous grand jury which had returned the first indictment. The witness further testified regarding statements affecting the judge of the superior court; that he had said to Mr. de Ligne, on an occasion prior to that referred to as the restaurant talk by the witness de Ligne: 'I don't want to talk to you. If the testimony of H. E. Johnstone is true, that you and Judge Farmer have been traveling around this state in collusion with an ex-convict for the purpose of liberating a child-rapist and of destroying my efficiency as district attorney, and ruining me and my character, I think you are a pair of crooks; I don't want to talk to you.' Further, that he had told de Ligne that Judge Farmer had been the bitterest enemy he had in the world; that his bias and prejudice had blinded him to take unjust and outrageous action. The witness made no denial of the conversation having occurred in the restaurant in terms as stated by de Ligne. He said that in all of his actions in the McCutchen case he was not prompted by any motive except to cause reparation to be made by McCutchen for the wrong he had done to Effie Thompson. At another point in his testimony he stated that his purpose was to save from wreck four lives, to wit: McCutchen's, Mrs. McCutchen's, Effie Thompson's, and the child of the latter. It appeared from this testimony that McCutchen had afterward had two trials on the charge, in both of which the jury disagreed, and that he was finally acquitted. He further said: 'At the same time I deemed it my duty as district attorney and in the interest of justice to do exactly what I was doing, in view of the circumstances and conditions in Kern County at that time; and I would believe it to be my duty to do exactly the same thing if the same circumstances and conditions confronted me again.' He added in another answer, that the character of the Thompsons also influenced him in his action in the McCutchen case. He also added, in response to a question of his counsel, that he had never practiced law in the state of California, except that he had in some cases rendered gratuitous services.

"In considering the testimony in support of the charge that respondent solicited money with the intent that it should be paid to influence him in his official conduct, it must be remembered that the testimony was given by witnesses whose interest in the matter at the time the affidavits were made and presented to the grand jury was of the greatest. E. W. McCutchen himself testified that his purpose in making the affidavit accusing McCowan of soliciting a bribe, a certified copy of which formed the basis of the inquiry made by the grand jury, was to affect the action of the jury and court in the matter of his own case. In view of the interest of the witnesses whose sworn statements were embodied in the affidavits and whose testimony was reproduced at the hearing herein, it best comports with fairness to conclude, which we do, that the district attorney in his negotiations with the McCutchens having reference to the payment of money by them, was acting solely with a view to securing that money for the purpose of aiding the Thompson girl. That his action, taken upon his own statement of the matter, was to the highest degree improper, in our opinion, admits of no question. Indeed, the lack of his appreciation of the impropriety of his course in the McCutchen case seems inexplicable and deserving of the severest censure. Closely analyzed, we find from the evidence that the whole purpose of the district attorney in the inducement which he offered to secure the return of McCutchen to the state of California and as a consideration for the recommendation which he promised to make to the court that McCutchen should be released on probation was to secure a settlement in favor of the girl in the case wherein he was charged with committing rape. In his testimony he stated that McCutchen, the accused, asked him what he should do, to which he replied that McCutchen should provide for the girl and plead guilty. He seems to have assumed the entire responsibility for the making of the settlement on behalf of the girl, for he says that when the father of the former had an action brought for civil damages after McCutchen returned, that he (McCowan) was irritated thereat and visited the attorneys for Thompson with the idea of getting them to withdraw the action. He said he told them the 'terms' upon which he had secured the return of McCutchen. These terms, it was very clear, were that McCutchen should make monetary provision for the girl and enter a plea of guilty, upon which

the district attorney would use his influence with the court to secure a probationary order. McCutchen was to provide for the girl and was then to escape a prison sentence, if it were within the power of McCowan so to procure such a result for him. We can find no words of approval for the action of any district attorney exercised in the direction of settling felony cases out of court. The duty of every prosecuting officer is, where sufficient evidence is obtainable to warrant a well-founded belief in his mind that the person accused is guilty, to present such evidence to a court or jury and not use his position and power in negotiating with the defendant for an adjustment of damages to the prosecutrix in consideration of promised favorable action. The latter remedy belongs to the civil side of the tribunal and one altogether outside the cognizance of a district attorney. The prosecuting officer here accused acted with an entire and complete misconception of what his official duty required of him in attempting to 'trade' with the defendant in a criminal case. However, we have stated that we think his action was not that described by the prosecuting witnesses, to wit: Designed to secure money for his own use, and so acquit him of such criminal intent. Neither can it be concluded that any action of his taken before the grand jury was of influence in determining a report to be made other than as it was intended by the jury that report should be. We regret, however, that we are compelled to characterize the acts of the accused before the grand jury as highly improper. The common ethics of the profession would, we think, suggest to the average lawyer that the district attorney should have refrained from appearing before the grand jury while the matter of his own alleged misconduct was under investigation. With our understanding of the law, we would deny that he had any right to be present at the sessions of the grand jury, either in person or by deputy, while charges against him of a criminal nature were under investigation. The law, it is true, does permit the district attorney to be present where criminal matters are being investigated, but that provision, we can readily see, is for the purpose of enabling the district attorney to present his evidence against the accused whose indictment is sought or is being considered. It would hardly be supposed that the district attorney would prosecute himself, and that the provision of law which we

have referred to is wholly inapplicable, must suggest itself most convincingly. The statement made by respondent before the grand jury that one of their number had been indicted for some crime, where the juror referred to had been acquitted, was a thing which savored not of fair practice. In his reference to the judge of the superior court, the accused, without justification so far as appears, used language harsh in the extreme, for which, to say the least, he is deserving of most severe criticism and reprimand. It appears that these statements were made, however, after all action had been taken in the McCutchen and McCowan matters by the grand jury and Judge Farmer. The respondent seems to have been obsessed with the idea that he was being combated on every pretext by the court and practically the entire Bar of Kern County, and in this attitude of mind was inclined to characterize the opposition in terms implying a want of any honesty on the part of those against whom he was arrayed. The judge of the superior court would have been remiss in his duty, where such a serious charge as that preferred against the district attorney was brought to his ears, not to have required an investigation of the matter. We would have imagined that such an investigation would not only have been sought on the part of an accused official conscious of his innocence, but, untrammeled by his advice to the grand jury in the matter, would have been demanded and insisted upon. The attitude of the respondent herein, however, was not so intentional or expressed. A question asked him by his own counsel and the answer thereto may be mentioned in palliation of his conduct in this regard. We quote from the transcript: 'Q. By the way, right in this connection, did you ever practice law in Bakersfield? A. I never practiced law in the state of California.' We may properly express the hope that as time passes the respondent, with advancing years and more practice, will acquire an appreciation of the demands which the ethics of the profession impose. So learning, he will no doubt avoid like acts of impropriety and vehement characterization of individuals which the evidence here ascribes to him. While condemning in the strongest terms the acts of impropriety with the commission of which we find respondent guilty, we are not prepared, however, to find that the facts require a judgment of disbarment or suspension from practice; and exercising

justly, as we believe, the discretionary power confided to this court,

"The judgment prayed for in the accusation is denied."

We are not disposed to question the correctness of the conclusions reached on the facts by the district court of appeal. That court heard the testimony as it fell from the lips of the witnesses themselves, and was in a far better position to weigh the evidence than we, after a reading of the bare record, could be. For reasons analogous to those which have always led reviewing courts to treat as conclusive findings of trial courts on conflicting evidence, we accept the opinion of the district court of appeal as a correct determination of the issues of fact.

We are, however, not in accord with the legal conclusions drawn by that court from the facts. While the opinion filed declares in terms that the conduct of the respondent was "highly improper" and "deserving of most severe criticism and reprimand," the judgment finally announced was merely one denying the relief prayed for in the accusation. In effect, the respondent was found guilty of professional misconduct, and was then discharged without the infliction of any penalty whatever. Even the mild punishment of a reprimand, which the opinion declares to be merited by the respondent's conduct, is not administered by the terms of the judgment itself.

But, apart from the mere form of the judgment, we are satisfied that a simple censure or reprimand would not be an adequate or appropriate penalty. Accepting the conclusion of the district court that the respondent did not, in any of the transactions complained of, seek any pecuniary advantage for himself, it still remains that he was, in various matters under examination, guilty of most serious improprieties. As district attorney, charged with the high duty of promoting the efficient and impartial administration of the criminal law, he indulged in practices having a direct tendency to hamper and subvert such administration. In addition, his use of abusive and offensive language regarding the judge of the superior court was without a shadow of justification.

It has been held here that there is in this state no authority to disbar (or suspend) an attorney for any ground other than those enumerated in section 287 of the Code of Civil Procedure. (*In re Collins*, 147 Cal. 8, 13, [81 Pac. 220].) But

one of the grounds specified in that section is "any violation of the oath taken by him, or of his duties as such attorney and counselor." (Subdivision 2.) The acts committed by the respondent were in violation of his duties, as the same are defined in subdivisions 1 and 2 of section 282 of the Code of Civil Procedure. Such acts were, we think, too grave to justify a court in dismissing the accusation with an announcement of its disapproval of the conduct of the accused. Some substantial punishment should be imposed. We think, however, under all the circumstances of the case, that the extreme penalty of disbarment is not called for. Taking into account the entire history of the proceedings, we are inclined to the belief that the respondent's misconduct arose rather from ignorance of fundamental legal ethics than from any deliberate intention to accomplish evil ends. It seems probable that it was a mistaken and excessive zeal that led him into the use of unjustifiable methods. Of course, ignorance of the law does not excuse misconduct in anyone, least of all in a sworn officer of the law. But this is a *quasi*-criminal action, and in fixing the penalty to be imposed the court should properly take into account the motives and purposes which actuated the accused. Applying these considerations, we think the requirements of the situation will be satisfied by a judgment suspending the respondent from practice for a limited time.

It is ordered that the respondent, Barclay McCowan, be suspended from practice in any of the courts in this state for the period of one year from and after the date upon which this judgment shall become final.

Melvin, J., Henshaw, J., and Victor E. Shaw, J., *pro tem.*, concurred.

ANGELLOTTI, C. J., Concurring.—I concur in the judgment and in the views expressed by Mr. Justice Sloss. There is ample support in the record for the conclusion that whatever of misconception of the proper scope of his functions as district attorney in his endeavor to adjust the McCutchen matter there was on the part of the accused, there was no attempt or intent to profit personally thereby, but simply a desire to see some provision made for the injured girl and the child. According to the evidence on which this conclusion was based, the undertaking of the accused was that if

McCutchen would return to the state, submit himself to the jurisdiction of the court, make reasonable provision for the girl and the care of the child, and plead guilty to the charge against him, he would recommend probation. Surely it cannot be said that there is anything of moral turpitude in this. The dissenting opinion does not suggest that the conclusion of the district court of appeal on this matter is not fully sustained by the evidence.

The investigation by the grand jury was one concerning this matter, based on an accusation made by McCutchen to the effect that the accused as district attorney demanded money for himself in consideration of his proposed action in the matter. The matter was very properly referred by the judge of the superior court to the grand jury for investigation. Of course, the charge was such as to demand the most thorough investigation, and, if well based, not only the removal of the district attorney from his office, but also his punishment for a grave felony. And it goes without saying that in the matter of the investigation the accused had no right to be present, either in person or by deputy, and that it was altogether improper for him to attempt to influence that body to bring in a report favorable to him, either by persuasion or threat, and especially by any assault on the character of any member of the jury. I do not for a moment justify the conduct of accused in this matter. But I do think the language of my learned associate in his dissenting opinion regarding this matter is too harsh, and hardly presents the case of accused in as fair a light as the record warrants. There is evidence indicating that there was a bitter factional fight in Kern County, political in nature, the district attorney being the special object of hatred of one of the factions. With the merits of that conflict we have here no concern. The accused probably had every reason to believe that this accusation, which we must take as absolutely false in fact, was a means by which the opposing faction was seeking to obtain his removal from office. It appears, that prior to any attempt to influence the jury to bring in a report favorable to him, that body had already voted to ignore the charge. It is quite probable that the accused feared that improper influences were being brought to bear on the jury to prevent the presentation of the favorable report, to which, if innocent, he was entitled, and that it was for this reason that

he resorted to the methods complained of. Censurable as his conduct was in this regard, I am not prepared to hold that there was anything of moral turpitude in it.

His reflections on the judge of the superior court were entirely without basis in fact, and so far as I can see, accused had no good reason whatever for believing otherwise.

On the whole I believe the ends of justice will be fully subserved by the penalty imposed.

Lawlor, J., concurred.

SHAW, J., Dissenting.—I dissent.

The statements in the opinion of the district court of appeal regarding the first charge against McCowan, that is, that he attempted to intimidate and coerce the grand jury with reference to the action that body would take upon certain charges against McCowan then pending before it, do not state the case fully or adequately, but gloss it over, apparently for the purpose of palliating conduct of McCowan, which I think the evidence shows to have been a gross offense against morals and decency, and to establish moral turpitude, as well as an attempt to corrupt and coerce the members of the grand jury. The evidence shows that while the investigation of affidavits against McCowan himself, making charges which, if true, would tend to show that he was guilty of soliciting a bribe or of an attempt at official extortion or compounding a felony, was pending before the grand jury, McCowan, then the district attorney of the county, insisted on being present, and was present at its deliberations upon the matter; that he repeatedly, during said time, threatened members of the grand jury that he would make charges against them of a nature which would expose them to obloquy and disgrace, and that he presented to said body a certified copy of an Arizona indictment charging a member of said grand jury with a felony, he then well knowing that there had been a trial thereof and that said member had been acquitted of the charge, and that with this knowledge he read the indictment to the grand jury, but did not inform the jury of said acquittal; that he frequently during said investigation talked to members of the jury about the charges against himself, both while the jury was in session and during adjournments, endeavoring to induce, persuade, and threaten

them in respect to their action upon the charges against himself. His conduct in this matter alone calls for the severest punishment that can be given in this proceeding, his removal as an attorney, his final disbarment.

To say that this conduct was due to his ignorance of fundamental legal ethics is to palter with a gross offense and to shut our eyes and minds to all the reasonable inferences arising from the facts. They fully establish the proposition that he was using these means, this intimidation and coercion, in the endeavor to prevent the grand jury from bringing an accusation to remove him from his office, or from making a report unfavorable to him. The fact, if it be a fact, that the grand jury would have refrained from bringing any such accusation, or from making an unfavorable report, even if he had not made these unseemly and immoral efforts to have it so, and that it did so refrain, does not in the least excuse him. It is obvious that it was not ignorance of right and wrong, but his own personal interests, that moved him thus to violate his official duty as district attorney, his official oath as attorney at law, and the laws of morality and propriety. If he was obtuse and so devoid of moral sense that he believed such conduct to be rightful and lawful, then he is certainly unfit, by reason of his depraved moral character, to hold the honorable and highly confidential office of attorney and counselor at law. It is my opinion that the judgment of the court should be that he be removed from that high office, and that the punishment of suspending him for one year is wholly inadequate to the gravity of the offense and to the protection of the profession of law and of the people who must resort to lawyers for advice, against the evils of having unworthy persons hold such station.