[Civ. No. 14805. Second Dist., Div. One. Dec. 26, 1945.]

WEST COAST HOME IMPROVEMENT CO., INC. (a Corporation), Appellant, v. CONTRACTORS' STATE LICENSE BOARD, Respondent.

Jerry Giesler and Robert A. Neeb, Jr., for Appellant.

Robert W. Kenny, Attorney General, and Bayard Rhone, Deputy Attorney General, for Respondent.

WHITE, J.—Petitioner and appellant (hereinafter designated as petitioner) filed in the superior court a petition for a writ of mandate directing the defendant and respondent (hereinafter referred to as respondent) to set aside its order and decision revoking the contractor's license of petitioner, to restore said license to petitioner, and to dismiss the complaint and proceedings thereon pending before respondent board. From a judgment denying the peremptory writ of mandate prayed for petitioner prosecutes this appeal.

For a number of years prior to the entry of the judgment herein petitioner had been licensed as a contractor and was carrying on such business in Los Angeles County. On or about August 23, 1943, a complaint was filed with respondent board wherein petitioner was charged with violating the provisions of sections 7109, 7111, 7114, 7115, 7116, 7117 and 7118 of the Business and Professions Code. Within the time provided by law petitioner filed with respondent board a written answer to the charges set forth in said complaint. Thereafter a hearing was had as provided by law before a duly appointed, qualified and acting deputy registrar of contractors. The proceedings at such hearing were taken down in shorthand and later transcribed. At the conclusion of the hearing the deputy registrar presiding thereat made and signed written findings and recommendations. Subsequently, on December 7, 1943, the registrar of contractors made, signed and filed a decision in said proceeding finding the petitioner guilty of violating the aforesaid provisions of the Business and Professions Code and revoking its license to engage in the contracting business in the State of California. On December 21, 1943, petitioner filed a petition for rehearing, which was denied by the registrar of contractors on January 18, 1944.

Thereafter petitioner, pursuant to the provisions of section

7099 of the Business and Professions Code, filed in the Superior Court of Los Angeles County a petition for a writ of mandate wherein it was asserted that the deputy registrar who conducted the hearing before the state board was biased and prejudiced. Said court issued an alternative writ of mandate, and upon a hearing had thereon considered the entire record of the evidence introduced at the proceeding had before the state board. Thereafter said superior court made comprehensive findings and concluded that "the petitioner was afforded a full and fair hearing before the respondent (state board); that there is adequate competent evidence to sustain the findings, decision and order revoking the petitioner's license, and that the order of the respondent was not arbitrary, capricious, illegal and fraudulent; that petitioner has not sustained the burden resting on it to plead and prove that the respondent acted contrary to the weight of the evidence or that he acted arbitrarily, capriciously, fraudulently or illegally, or in abuse of the discretion or without due regard to the rights of petitioner; the court finds no reason for annulling the order of the respondent (state board) and on the contrary finds that the order should be sustained." The superior court thereupon entered its judgment discharging the alternative writ of mandate and denying a peremptory writ.

The complaint lodged against petitioner before the state board charged it with willful departure from or disregard of plans and specifications in material respects (§ 7109); failure to make and keep records in accordance with the provisions of section 7111; aiding and abetting an unlicensed person to evade the provisions of chapter 9 of the Business and Professions Code (§ 7114); failure to comply in a material respect with the provisions of chapter 9 of the Business and Professions Code (§ 7115); the doing of willful and fraudulent acts as a contractor in consequence of which substantial injury was caused to others (§ 7116); acting in the capacity of a contractor in violation of the terms of section 7117; and knowingly entering into contracts with a contractor while such contractor was not licensed as provided by chapter 9 of the Business and Professions Code (§ 7118).

Petitioner's method of doing business which was challenged by the complaint filed against it before the state board may be epitomized by the testimony of Mrs. Emma Moedl, one of

some fourteen people who entered into contracts with petitioner for the improvement of their properties. This witness was first contacted by a Mrs. Morrison and a "Dr." Kossis, representatives of petitioner. This witness was asked by them if "she would be interested in having siding put on our house?" to which she replied, "We had thought quite a bit about it." The witness was informed by petitioner's representatives that they would put asbestos siding on her home and that they would do a "spray job" for termites. It was also represented to Mrs. Moedl and her husband that their home was selected as a "model" or "display" house; that pictures would be taken of the same; that only one such "model" or "display" house would be selected in each district; that the pictures would be used as an advertising medium; that petitioner's salesmen would be permitted to "show our home to any prospective purchasers of asbestos siding"; that when any sales were made to prospective purchasers whose names were furnished to petitioner by the Moedls or as a direct result of "using our home" as described above, the sum of $20 would be paid to the house owner, thereby decreasing the amount of the contract price for the siding and termite spray job. The entire job, including the spraying, was to cost $400 and was to be put on a three-year contract with the Bank of America. The Moedls advised Dr. Kossis, one of petitioner's representatives, that they had found one corner of the front room where the termites were just starting to come through, and that they would not contract for the work unless the house was completely sprayed for the elimination of termites. According to Mrs. Moedl, she and her husband signed "some papers" and Mr. Moedl signed a National Housing Agency form 60-5, which was an application for exemption from Regulation "W" governing the remodeling and rehabilitation of properties in order to maintain housing facilities in private war housing priority localities. The National Housing Agency form was introduced in evidence, but was not filled in at the time it was signed. This form contained the question, "Will the housing accommodation become uninhabitable (meaning a definite hazard to the health or safety of the occupants, not merely an inconvenience) if each item of the repair listed under Section B is not performed in ninety (90) days after the date of this application?" In order that the improvements might be made it was required that this question be answered in the affirmative.

In this regard a letter was introduced in evidence, written by William A. Pirsig, a contractor employed by petitioner to make inspections of houses upon which petitioner had contracted to do work. In his letter Mr. Pirsig stated that the siding on the Moedl house was ''very badly warped and checked and has several large pieces broken entirely out. The paint is also in a very deplorable condition, being badly scaled and peeled, and also very badly weather-beaten.'' In his letter Mr. Pirsig further stated, ''It is my opinion that to prevent the ruination of the interior plaster which would soon be caused by the penetration of the elements through the above-mentioned holes and cracks, and also to protect the health of the tenants, this house should definitely be repaired at once, and it is my belief that the best and most economical method of repair is to re-side all exterior walls with some good grade of pre-finished insulated siding.'' There was testimony that the house had been painted yellow, trimmed with brown, approximately fifteen months before the siding was put on, and that the paint was in good condition and not badly scaled, peeled or weather-beaten. It is true the testimony does show that the french windows were not as tight as they should have been and did not have weather-stripping on them. No pictures were ever taken of the premises, Mrs. Moedl did not receive any bonus, although she did not send in any cards, although one man did come to look at the house. Apparently the contract was substantially performed except for the spraying of the underpinning. A truck driver unloaded the shingles and paint and took off a machine for spraying. This did not take over fifteen minutes. Mrs. Moedl asked him if he was through spraying and he replied that he was, stating that the jet he was using would ''shoot forty to fifty feet in a few minutes.'' From the testimony it also appears that in putting on the siding petitioner partially covered up part of the vent.

■ With reference to the alleged violation of section 7109, there was evidence to support the finding of the hearing officer and the court that ''the petitioner did depart from the specifications in a material respect in that in ten out of fourteen written contracts admitted in evidence said contracts provided that petitioner should spray all underpinning; the evidence shows that the petitioner did spray some of the underpinning on five of said ten jobs and the evidence conclusively shows that on the remaining five jobs the amount of spraying that was done was inconsequential; the petitioner contended

that the term, 'spray all underpinning,' meant merely to spray the mudsills; but the petitioner corporation is under the close joint control of its two officers, one of whom is an experienced contractor, and the term 'underpinning' is well known in the contracting business and does not mean 'mudsills'; the petitioner in attempting to secure jobs from home owners contended that the spray work constituted a valuable service to the building as a termite cure and preventive; said home owners relied upon such representation with respect to spray work and awarded said contract to petitioner in the belief that the spray work constituted a substantial part of the entire value of the work to be done; the work done by the petitioner in spraying was inconsequential and in many instances entirely valueless.''

■ With reference to the alleged violation of section 7111, there was testimony to support the court's finding that ''the evidence is clear and convincing that it did make and keep records of a sort, but such records were not clearly decipherable even by the officers of the petitioner.''

■ There was also substantial evidence to support the finding that petitioner violated section 7114, 7117 and 7118, in that it did ''aid salesmen and solicitors and representatives named in the complaint to evade the provisions of the Business and Professions Code relating to contractors; said salesmen were not licensed as contractors; the petitioner knowingly combined and conspired with said unlicensed persons and allowed his license to be used by said unlicensed persons and acted as an agent and a partner of such persons to evade the provisions of said chapter of the Business and Professions Code; the petitioner's business is solely based upon contracts secured by his salesmen, who are usually preceded by a so-called 'bird dog' to make the original contact and to open negotiations; the salesmen are paid by the petitioner, not on a salary or a straight commission basis, but by a somewhat involved formula which constitutes a division of the profits; if the salesman secures the contracts upon which there is more than normal or average amount of profit, the salesman's percentage in that job is increased, but if the salesman makes an error and underestimates the size of the job and thereby the profit is less than expected, the salesman loses because of his error; the salesman has absolute authority to enter into contracts in the name of the petitioner without the petitioner becoming aware of or approving the transaction; the sales-

men are sent out into the field armed with blank contracts printed with petitioner's name and given no instructions or methods to be used in securing contracts other than that the petitioner prefers the salesmen not to secure contracts based upon a price exceeding a certain maximum per unit of exterior surface to be shingled; the petitioner did not have the normal employer-employee control of his salesmen or representatives; the petitioner denies all responsibility for his salesmen's actions, and contends they operate 'independently as sales representatives on a commission basis'; the petitioner further alleges by his answer that 'these individuals are privileged to take orders for various essential repairs to any authorized contractor capable of furnishing the required material as necessary' for completing these specifications set forth in the various orders; the salesmen's employment by the petitioner is not considered by the petitioner to come within the scope of the Social Security laws or the withholding provisions of the Federal Income Tax Laws; the salesmen are contractors operating under the license of the petitioner and said salesmen are not licensed as contractors; they secure contracts which they and the petitioner jointly execute with the petitioner actually doing or having most of the work done; stated differently, the petitioner attends to the construction end of the business, with some exceptions, and the various salesmen attend to the selling, and after the payment of the petitioner for his work and costs, the profits are divided.''

The evidence supports the finding that petitioner violated section 7116, in that it represented that the spray job was "equal in value and effect to a complete termite treatment under the houses, but knowing in fact it was only going to cover the mudsills, and that that was not a successful treatment to eradicate termites throughout the underpinning as a whole.

''It was represented that the regular price of this product was greatly reduced due to allowing the homes to be used as 'models', when in truth and in fact the usual prices charged by the petitioner was about $39 to $42 per square, whereas the normal price was only $22.50 per square, and that $22.50 is a fair and equitable price per square for such produce in the locality.

''It was further represented that pictures were to be taken before and after applying the siding, and that he would show

these places, and their owners would receive bonuses from all subsequent jobs in that district, which would greatly offset their contract and loan payments, the petitioner did not at that time or any other time intend to comply with such representations and he did not comply with such representations.''

''The petitioner's method in selling 'model house' or 'bonus transactions,' which method was used in all cases herein, was to lead the owner to believe that a bonus would be paid for every job done in that general neighborhood, and that the house would actually be advertised by 'before and after' pictures; the procedure set up for the payment of bonuses and the advertising of houses, in so far as the actual contractual documents are concerned, did not bind the petitioner to pay any bonuses unless the owner personally secured the prospect; nor did the petitioner bind himself to take pictures or to advertise the house; by securing the permission from the owner to advertise the house, the petitioner led the owner to believe that such would be done, which would lead to the payment of bonuses to the owner; in almost every instance the owner was misled as to the intentions of the petitioner; and the court finds that the petitioner purposely so conducted the conversations and negotiations that the wrong impression was left with the owner; the sales talk of all of the salesmen and solicitors was so similar as to indicate a concerted program, and the similarities were not either accidental or a mere coincidence.''

''That he influenced property owners to sign National Housing Administration Form 60-5 on jobs for a loan of more than twelve months, and the petitioner signed such forms himself to the effect that these particular houses were in need of repair; that in 10 contracts out of 14 which were admitted in evidence the 36-month loan under the jurisdiction of National Housing Administration was secured; in each instance in order to secure such a loan it was necessary to answer the following questions in the affirmative: 'Will the housing accommodations become uninhabitable (meaning a definite hazard to the health or safety of the occupants, not merely an inconvenience) if *each item* of repair listed under question V is not performed in ninety (90) days after the date of this application?'; that in every case it absolutely was unnecessary for the work to be done in order to keep the accommodations from being uninhabitable within ninety lays; it is true that the work to be done did constitute some improvements to

the building which might, by using great imagination, be slightly connected to protection of health, but the work only remedied a condition which had existed for a long time during which the building had been inhabited, and there was no evidence that the condition in any instance had become critical; for the most part the work constituted mere beautification or luxury repairs; these National Housing Administration applications were signed in blank by the owner, but were actually filled out by some member of the petitioner's personnel who later described the work to be done and the necessity for it; the petitioner took steps to keep from knowing whether or not the statements as to the necessity of the work were true; the petitioner employed a licensed contractor as an 'inspector' upon a basis which permits petitioner to call him an independent agent, since he was paid $5.00 for each inspection; this contractor inspected the premises and then filed with the petitioner a written statement describing the condition of the building and outlined what work should be done; upon the basis of this letter, the petitioner then completed the application which had been signed in blank by the owner; the application was then filed with the bank which automatically extended a 36 months credit to the owner; this inspection was ordinarily made after the material was dumped on the job; the statements made by the contractor in his inspection reports were largely false and extorted and in most instances had no resemblance whatever to the truth; this contractor, in addition to performing the services related hereinabove, was also employed by the petitioner in another capacity and paid wages for said services; the owners who signed such application blanks were not shown what they had signed and on the contrary they were kept from knowing the full purport of the document they had signed but they were informed that it was merely a request for priority.''

As a first ground of appeal petitioner contends that although in its pleadings a trial de novo was demanded the same was refused by the court. Under the law, the petitioner was not entitled to an ''unqualified or unlimited trial de novo to which a litigant is entitled in the superior court on appeal from a justice's court on questions of fact or on questions of both law and fact (Code Civ. Proc., sec. 976), where, justifiably or not, he may present a 'skeleton' case in the lower court and reserve the real showing on the merits for the trial in the superior court.'' (*Dare* v. *Board of Medical Exam-*

*iners,* 21 Cal.2d 790, 795 [136 P.2d 304]; *Russell* v. *Miller,* 21 Cal.2d 817, 819 [136 P.2d 318].) ██ As was said by this court in denying a writ of supersedeas in the instant case (*West Coast etc. Co.* v. *Contractors' State License Board,* 68 Cal.App.2d 1 [155 P.2d 863], ''While neither party to a mandamus proceeding is bound in all particulars by the record before the board and the trial court in such a proceeding is not confined to such record, nor bound by the findings and determination of the board, nevertheless, in order to introduce further and additional evidence there must be a showing, for instance, that from the record it appears 'that incompetent evidence had been received by the board' in which event 'the complaining party should not be foreclosed from objecting on the trial to its admissibility. Also if the board had improperly refused to enterain admissible evidence the litigant should not be foreclosed from offering it at the trial. If additional evidence not included in either category be sought to be introduced by a party, the court has the right to receive it upon a showing that, in the exercise of reasonable diligence, it could not have been introduced before the board. If the credibility of witnesses before the board be brought in question in the mandamus proceeding the opportunity should be afforded for further examination or to contradict or impeach their testimony under well recognized rules of evidence and procedure' (*Dare* v. *Board of Medical Examiners, supra,* pp. 799, 800). In the case just cited, it is further held that it is the duty of the petitioner to set forth in his petition for the writ his objections to the proceedings had before the board, if such proceedings are to be questioned.''

██ No reporter's transcript has been presented as part of the record on this appeal and the clerk's minutes of proceedings had upon hearing of the petition for a writ of mandate are not contained in the clerk's transcript. Nowhere in the record before us does it appear that at the trial petitioner produced any witnesses or made any offer of proof with reference to any evidence which it was claimed the administrative board refused to entertain, nor was any evidence offered in addition to that received at the board hearing. In its amendment to the petition for the writ in the trial court petitioner set forth some sixty specifications of claimed error on the part of the hearing officer in admitting allegedly erroneous evidence. A record of the proceedings had before the board was filed in the trial court and by reference thereto in

the pleadings was made available for consideration by the court for a proper determination of the questions presented by the pleadings. With reference thereto there appears in the findings the following:

"The court carefully considered the entire record of the evidence introduced and the proceedings had before the respondent, together with the complaint filed with respondent and the findings and order made, and evaluated the evidence and gave consideration only to the legally admissible evidence and therefrom made its independent findings and conclusions; . . ."

It is noteworthy that in connection with the charge made against petitioner wherein it was accused of violating the building ordinances of the cities of Los Angeles, Gardena and Redondo Beach, the court held that the evidence offered in substantiation thereof was inadmissible and disregarded the same in its entirety.

The record before us reflects no showing to bring this case within the doctrine enunciated in *Dare* v. *Board of Medical Examiners, supra,* or *Russell* v. *Miller, supra,* which would entitle petitioner to present evidence in addition to that offered before the board. The trial court was not advised, nor is this court apprised, of any admissible evidence which the board refused to entertain, nor is any showing made as to any additional evidence which petitioner sought to introduce before the trial court. In the absence of a reporter's transcript, we must assume from the findings that the petitioner was not foreclosed in the trial court from objecting to any incompetent evidence received by the board; but on the contrary, as heretofore pointed out, the trial court rejected certain evidence presented to the board and sustained objections to its competency.

If petitioner contends that he was entitled to an unlimited trial de novo and that the witnesses produced at the board hearing should again be called and re-examined as to facts about which they testified before the hearing officer, the petitioner is in error, as to his rights, for as held in *Dare* v. *Board of Medical Examiners, supra,* at page 799, it was never contemplated that the evidence presented to the board and contained in the record of its proceedings should be reiterated before the court.

Petitioner next asserts that the hearing officer was biased and prejudiced against it by reason of which it was

denied a fair and impartial trial. A review by us of the proceedings had before the state board leads us to concur with that portion of the court's findings wherein it was said: ''The court finds from the remarks and the language in the reporter's transcript that some of the questions framed by the hearing officer were framed in such a way they might indicate the hearing officer did not show impartiality; the attitude of the hearing officer has caused the court to scrutinize the record more closely than would otherwise have been necessary in order to determine whether or not the record sustains the order revoking petitioner's license; the hearing officer did warn some of the witnesses on their constitutional rights to refuse to testify; said admonition in every instance was stated in the presence and the hearing of the petitioner; the hearing officer, however, did not admonish the officers of the petitioner corporation of any constitutional rights to refuse to testify.''

After thus carefully scrutinizing the record, the court made the findings hereinbefore narrated, and as heretofore stated by us, there was competent and substantial evidence in the record to sustain such findings. While we are not prepared to negative petitioner's claim that the attitude of the hearing officer toward Jacob Johnson, its president, was brusque, and we may say, manifested toward him a feeling of considerable displeasure which does not appear to have been warranted and of which we do not approve, the hearing officer was also abrupt, curt and brusque on occasions with the representative of the state board who was prosecuting the charges made against petitioner. However, the fact that the hearing officer may have exceeded the bounds of propriety does not entitle petitioner to have the decision of the administrative board annulled when competent and admissible evidence sustains the findings and order made by such board.

Finally, petitioner challenges the validity of the state board's order on the ground that it was deprived of a constitutional right in that petitioner corporation's president, Jacob Johnson, was called to and did testify under section 2055 of the Code of Civil Procedure in the absence of any admonition by the hearing officer of Mr. Johnson's right not to be compelled to be a witness against himself (5th Amendment, Const. U. S.; § 13, art. I, Const. Cal.). It is petitioner's contention that the charge made against it under section 7114 of the Business and Professions Code is denounced as a mis-

demeanor by section 7030 of the same code, by reason of which, petitioner argues, Mr. Johnson should have been advised of his right to refuse to testify if his testimony would tend to incriminate him. While it is true that the hearing officer did not warn Mr. Johnson of his constitutional right, it is nevertheless a fact that some of the other witnesses were advised of their rights in this regard and in every instance the admonition was given in the presence and hearing of petitioner's president. At the start of the hearing Mr. Johnson and his associate, Mr. Katz, were fully advised of their right to be represented by counsel, but they expressed their desire to proceed with the hearing without the aid of counsel.

It is clear from the record that petitioner as a corporation was owned and controlled by its president, Johnson, and vice-president, Katz. It is established law that there is no constitutional privilege for an officer of a corporation as such to refuse to testify. (*United States* v. *White,* 322 U.S. 694, 699 [64 S.Ct. 1248, 88 L.Ed. 1542, 152 A.L.R. 1202] ; *Wilson* v. *United States,* 221 U.S. 361 [31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas. 1912D 558].) Furthermore, despite early cases which speak in general terms of the analogy between administrative proceedings for the revocation of a professional or business license and a criminal prosecution, a veritable forest of cases have rejected the contention that such administrative proceedings "are to be governed by criminal law theories on matters of evidence." (*Webster* v. *Board of Dental Examiners,* 17 Cal.2d 534, 538 [110 P.2d 992].)

The object of establishing the Contractors' State License Board and vesting in the registrar of contractors disciplinary powers is for the protection of the public. The law is intended primarily to keep the contracting business clean and wholesome, to the end that it may merit the respect and confidence of the public in general and in particular those who have recourse to contractors in the construction or improvement of their properties. Therefore, the purpose of a disciplinary proceeding such as the one with which we are here concerned is to determine the fitness of a licensed contractor to continue in that capacity. It is not intended for the punishment of the individual contractor, but for the protection of the contracting business as well as the public by removing, in proper cases, either permanently or temporarily, from the conduct of a contractor's business a licensee whose method of doing business indicates a lack of integrity upon his part or a tendency

to impose upon those who deal with him. A disciplinary proceeding such as the one in the instant case is comparable to such a proceeding under the State Bar Act. In the case of *Fish* v. *State Bar*, 214 Cal. 215, 222 [4 P.2d 937], the Supreme Court, in disposing of the claim that it was error to call the accused attorney to the stand and compel him to testify, quoted with approval from *In re Vaughan*, 189 Cal. 491, 495 [209 P. 353, 24 A.L.R. 858], as follows:

"It is insisted by appellant that the court erred in allowing him to be called to the stand and compelled to testify over his objection. He contends the disbarment proceedings are in the nature of a criminal action and that the accused in such a case should be accorded the same right to refuse to testify as is a defendant charged with the commission of a crime. This position cannot be maintained. Although it has been held that an accusation is in the nature of a criminal charge (*Matter of Hammond*, 121 Cal. 385 [53 P. 899]), and that a proceeding on such a charge is a *quasi*-criminal action (*In re McCowan*, 177 Cal. 93 [170 P. 1100]), 'this court has uniformly treated disbarment proceedings as peculiar to themselves, and governed exclusively by the code sections specifically covering them.' (*Matter of Danford*, 157 Cal. 425 [108 P. 322].) The purpose of such a proceeding is to determine the fitness of an officer of the court to continue in that capacity, and it has been said the disbarment of attorneys is not intended for the punishment of the individual but for the protection of the courts and the legal profession. (*Ex parte Finley*, 97 S.C. 37 [81 S.E. 279].)"

The court further quoted from the same case as follows:

" 'This is a special proceeding of a civil nature, and the rules applicable to criminal cases do not apply. (*In re Wellcome*, 23 Mont. 259 [58 P. 711]; *In re Randel*, 158 N.Y. 216 [52 N.E. 1106].) If the accused is not guilty, nothing would have been easier than for him to deny all knowledge of the charges laid at his door. His having failed to testify in his own defense, when he should do so, and deny the statements of Whiteside and Clark, not only justifies, but irresistibly implies, this court, upon the evidence before it, which is credible, to the conclusion that he is guilty.' In our opinion, in view of these considerations, this is not such a criminal prosecution against appellant as would entitle him to decline to testify on the ground that he cannot be compelled 'to be a witness against himself' (art. I, sec. 13, Const.), but he may be called and

examined for the information of the court, without, of course, infringing his right to decline to answer questions propounded to him on the ground that his testimony would tend to incriminate him.''

See, also, *Johnson* v. *State Bar*, 4 Cal.2d 744, 752 [52 P.2d 928].

Thus it becomes apparent that if an individual licensee could not refuse to testify upon the sole ground that he is an accused in a disciplinary proceeding, the officer of a corporate licensee certainly cannot complain that he was called to give testimony. The president of petitioner corporation, having been advised of his right to procure counsel and having declined so to do, and having been present when several witnesses were advised of their constitutional right to refuse to testify, it cannot be held that in calling him to the witness stand the hearing officer was guilty of prejudicial misconduct which requires a reversal of the judgment here appealed from.

There is in the record substantial testimony that petitioner sold siding on a ''model house deal'' whereby an owner was led to believe that his was the first house in the district upon which siding would be applied and that such house would be used for display purposes, and that thereafter such customer would receive a bonus from future sales of siding in that district, and which bonus would be substantial. There is also evidence that the customers were led to believe that they were getting a special discount by reason of the fact that their house had been selected for display purposes. The evidence also supports the finding of the trial court that these representations were false. There is further testimony that the aforesaid representations were apparently made to all prospective customers, regardless of whether or not petitioner had previously applied siding to houses in the immediate neighborhood. The finding of the court that these representations were made with no intention to use the house for display purposes, to take pictures of the same or to advertise it, is also supported by the evidence.

In support of the claim that some, if not most, of the customers were substantially injured through representations made by petitioner's agents, there is in the record evidence that petitioner's customers were led to believe that they were getting a special discount, although they were in fact paying a high price. In fact, petitioner's president testified that his base price was $22.50 per square. This was broken down to

amount to $9.00 for material, $4.00 for labor to apply the siding, $5.00 for overhead and $4.50 salesman's commission. He also testified that he could not do business on that basis. The testimony showed that the amount paid by most of the customers was between $35 and $40 per square, which price was considerably higher than the prevailing price. There is also testimony to support the finding of the trial court that petitioner represented that all underpinning of a customer's house would be thoroughly sprayed, and that such spraying would be a very effective means of eradicating termites or preventing termite infestation, when in truth and in fact the spraying actually done was worthless and only a very small area of each house was in fact sprayed.

From the foregoing, it must be held that the evidence supports the findings and the findings support the judgment, and that no prejudicial error appears in the record.

The judgment is affirmed.

York, P. J., and Doran, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 21, 1946.