[L. A. Nos. 20514, 20515.   In Bank.   July 30, 1948.]

JAMES A. MORAN, Petitioner and Appellant, v. BOARD
OF MEDICAL EXAMINERS OF THE STATE OF
CALIFORNIA et al., Defendants and Appellants.

Joseph Scott and Cuthbert J. Scott for Petitioner and Appellant.

Fred N. Howser, Attorney General, and J. Albert Hutchinson, Deputy Attorney General, for Defendants and Appellants.

SCHAUER, J.—In February, 1944, respondent Board of Medical Examiners (hereinafter termed the board) licensed petitioner James A. Moran (hereinafter called petitioner) to practice medicine and surgery in California. Thereafter petitioner developed a general practice of his profession at Carmel, in Monterey County. In May, 1946, a special agent of the board filed a written accusation charging petitioner with three counts of unprofessional conduct in the prescription of certain narcotics and asking that the board discipline petitioner. Following a hearing the board, on August 16, 1946, filed its written decision and order that petitioner was guilty as charged, that his medical certificate be suspended for one year, that for five years immediately following the year of suspension petitioner be on probation and neither have in possession nor prescribe narcotics, and that the decision "shall be effective immediately upon delivery of a copy thereof" to petitioner.

On September 26, 1946, petitioner filed in the superior court in Los Angeles his petition for a writ of mandate asking that the court review the proceedings before the board, set aside the decision and order of the board, and order that petitioner's license to practice medicine in this state be re-

stored; an alternative writ was issued the same day. The individual members of the board, as well as the board itself, are named as parties respondent in both the petition and the alternative writ. On October 16, 1946, the board by way of return filed its demurrer and answer to the petition for the writ; and there was also filed in the superior court a transcript of the proceedings before the board. That court, after a hearing but with no evidence other than the transcript of the board proceedings, overruled the demurrer, made findings in favor of petitioner, and ordered that the decision of the board be annulled, that petitioner's medical certificate be restored, and that petitioner recover his costs. The board has appealed from the judgment annulling its decision (L. A. 20514) and petitioner has appealed from the order of the court taxing his costs at only $31.60 and disallowing an item of $117 paid by him as the cost of the transcript of the proceedings before the board (L. A. 20515). We have concluded that upon the record and the applicable law the judgment of the trial court must be affirmed and that petitioner is entitled to recover the item of costs which was disallowed.

As grounds requiring reversal of the trial court's judgment in petitioner's favor, the board contends:

1. That the petition for mandamus was not filed within the time allowed by statute.

2. That the record of the proceedings before the board supported its decision, and the trial court had no power to set aside such decision.

### 1. *Time for Filing Mandamus Petition*

Section 11523 of the Government Code provides that judicial review of the board's decision ''may be had by filing a petition for a writ of mandate in accordance with the provisions of the Code of Civil Procedure. Except as otherwise provided in this section any such petition shall be filed within 30 days after the last day on which reconsideration can be ordered. . . . The complete record of the proceedings, or such parts thereof as are designated by the petitioner, shall be prepared by the agency and shall be delivered to petitioner, within 30 days* after a request therefor by him, upon the payment of the expense of preparation and certification thereof. . . . Where petitioner, within 10 days after the last day on which reconsideration can be ordered, requests the

---

*Prior to the 1947 amendment to section 11523 the period was ''20 days.''

agency to prepare all or any part of the record the time within which a petition may be filed shall be extended until five days after its delivery to him. . . .''

Section 11518 of the same code states that the board's decision ''shall be in writing,'' and section 11519 provides that the ''decision shall become effective 30 days after it is delivered or mailed to respondent [petitioner herein] unless: . . . the agency itself [here, the board] orders that the decision shall become effective sooner. . . .'' Section 11521 provides that the ''power to order a reconsideration shall expire 30 days after the delivery or mailing of a decision to respondent [petitioner herein], or on the date set by the agency itself as the effective date of the decision if such date occurs prior to the expiration of the 30-day period.''

In this case the board ordered that its decision be effective upon delivery of the written decision to petitioner. Delivery took place on August 19, 1946, and consequently the board's power to order a reconsideration expired on the same date, and the time allowed petitioner to file this mandamus proceeding expired 30 days later unless extended by other provisions of section 11523 of the Government Code. As noted hereinabove, the mandamus petition was filed September 26, 1946, or subsequent to the expiration of such 30-day period. Petitioner urges, however, that within 10 days of August 19, 1946, he ''requested the agency to prepare . . . the record'' of the proceedings before it, that he filed this petition for mandamus within five days after delivery of the record to him, and that therefore he acted within the time allowed by the provisions of section 11523, quoted hereinabove.

As originally filed on September 26, 1946, the petition for mandamus contained no reference to the facts which petitioner claims establish that the petition was filed in time. The board demurred to the petition on the grounds, among others, that the court ''has no jurisdiction of the subject of the purported cause of action set forth or referred to in said petition,'' that the petition failed to state facts sufficient to constitute a cause of action, and that the petition was not filed ''within the time permitted by law, and, more specifically,'' within 30 days after the effective date of the board's decision. With the demurrer the board filed its answer expressly admitting ''the allegations contained in Paragraphs I, III, IV, V and VI'' of the petition and denying all other allegations thereof. Thereafter petitioner, with leave of court, filed an amendment to paragraphs VI and VII of his petition. As amended, para-

graph VI alleges, among other things, that the board's decision "was made effective immediately upon delivery of a copy thereof to petitioner, and that said copy was received by petitioner on August 19, 1946; that on said August 19, 1946, petitioner requested respondent State Board of Medical Examiners, by requesting its duly appointed shorthand reporter, Ralph A. Sollars, to prepare a full and complete record of the proceedings held . . .; that on September 24, 1946, petitioner's attorney . . . received direct from said Ralph A. Sollars, via Railway Express, the record hereinbefore referred to and now on file with the above entitled court."

The board filed no answer to the amendment to the petition. Nevertheless, it now asserts that "none of petitioner's allegations upon this subject [request for the record of the board's proceedings], denied in the return, were proved. In fact, there was no attempt to prove them." Apparently the board is suggesting that the denials contained in its answer to the petition as originally filed should be deemed extended to relate also to new matter added by the amendment but that its express admission of the allegations of paragraph VI does not relate to that paragraph as amended. There is no merit in such suggestion. If the denials of the answer be deemed extended (and we are aware of no authority to support such an extension, in the absence, as here, of stipulation to that effect) to new matter pleaded in the amendment to the petition, then the board is in the position of denying not only that petitioner requested a copy of the board proceedings, but of denying also that a copy of its decision was ever delivered to or received by petitioner so as to set running the time allowed to petitioner to file this mandamus proceeding. "Every material allegation of the complaint, not controverted by the answer, must, for the purposes of the action, be taken as true. . . ." (Code Civ. Proc., § 462.) We are of the view that the board, by failing to deny the new factual matter contained in the amendment to the petition, must be deemed to have admitted it. (See 21 Cal.Jur. § 106, p. 155, and § 131, p. 188.)

The board urges that in any case a request made of the shorthand reporter to prepare the record of the proceedings before the board is not a request of "the agency" within the provision of section 11523 and did not operate to extend the time within which petitioner might file his mandamus petition. In support of its position the board points to section 1300 of title 16 of the California Administrative Code, by which it has

established the locations of its offices in Sacramento, Los Angeles, and San Francisco (see also Bus. & Prof. Code, § 2109); and to section 1303 of the same code, by which it delegates (pursuant to the authority of Gov. Code, § 11500) certain of its functions to its secretary-treasurer, "or in his absence from the office of the Board, to its Assistant Secretary." The board argues that its failure in this latter section to expressly delegate the function of receiving a request for a record of disciplinary proceedings before it, establishes that petitioner's request to the shorthand reporter amounted to no request at all, within the intendment of section 11523 of the Government Code. But the very language used in the last mentioned section carries an implication that it must be liberally, rather than narrowly, construed. The language is that "The complete record of the proceedings, or such parts thereof as are designated by the petitioner, shall be prepared by the agency," etc. It seems obvious that such part of the proceedings as is reflected only by the reporter's notes can "be prepared by the agency" only as it acts through the reporter. In other words, the reporter is necessarily representative of the agency in preparation of at least a part of the record. There is no denial that in this case Sollars was the agency's "duly appointed shorthand reporter" nor is there any contention that any person other than the official reporter could have prepared the record. Furthermore, section 11500 of the Administrative Code does expressly provide that "wherever the word 'agency' alone is used *the power to act may be delegated by the agency* and wherever the words 'agency itself' are used the power to act shall not be delegated unless the statutes relating to the particular agency authorize the delegation of the agency's power to hear and decide." (Italics added.) We are of the view that if such quoted section has any significance at all in relation to the proposition for which the board invokes it that it tends to support petitioner's position rather than that of the board. Certainly the function of making the record in the first place; i. e., of taking the notes in shorthand, was delegated to the official reporter; yet section 1303 is as silent on the delegation of that duty as it is on the function of preparing the transcript or receiving the request for the transcription.

The "Certificate of Reporter" attached to the record states that "the foregoing is a full, true and correct transcript of the shorthand notes taken by me in the above entitled matter, on the dates hereinbefore specified, and . . . is, a full,

true and correct statement of the proceedings had in the same matter as directed by the Board of Medical Examiners.'' In its answer to the petition for mandamus the board alleges that the record as filed in the trial court is accurate, and adopts into its answer by reference, all of the contents of such record. It also relies upon the same record to support its arguments on other phases of this case, hereinafter discussed. It is to be noted that such record contains not only the oral proceedings before the board, including photostatic copies of exhibits introduced, but also copies of the written accusation before the board, of Notices of Hearing, of petitioner's Notice of Defense, and of petitions and notices concerning the taking of depositions; in other words, the entire file of the board proceedings is seemingly included. Thus, the authenticity of the record is established; the attack is directed not at the authority of the reporter to have *prepared* the record for the agency but only at his authority to have *received the request* for the same on behalf of the agency. Under such circumstances, the holding of the trial court to the effect that petitioner's request to the reporter constituted substantial compliance with the statutory provisions and amounted to a request to the agency and that the act of the ''duly appointed reporter'' in furnishing the transcript was the act of the agency, must be sustained.

## 2. *The Evidence Before the Board*

Petitioner urges and the trial court found that certain of the findings of the board, upon which its decision rested, were not supported by the weight of the evidence received by the board, and, therefore, abuse of the board's discretion was established within the provisions of section 1094.5 of the Code of Civil Procedure. That section, enacted in 1945, treats of court review of administrative orders and decisions. It provides, among other things, that ''(a) Where [as here] the writ [of mandamus] is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in the inferior tribunal, corporation, board or officer, the case shall be heard by the court sitting without a jury. All or part of the record of the proceedings before the . . . board . . . may be filed. . . . If the expense of preparing all or any part of the record

has been borne by the prevailing party, such expense shall be taxable as costs.

"(b) The inquiry in such a case shall extend to the questions whether . . . there was any prejudicial abuse of discretion. Abuse of discretion is established if . . . the findings are not supported by the evidence.

"(c) Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence."

That the trial court in this case was "authorized by law to exercise its independent judgment on the evidence" is well established. (See *Dare* v. *Board of Medical Examiners* (1943), 21 Cal.2d 790, 795 [136 P.2d 304]; *Sipper* v. *Urban* (1943), 22 Cal.2d 138, 141 [137 P.2d 425]; *Hohreiter* v. *Garrison* (1947), 81 Cal.App.2d 384, 402 [184 P.2d 323].) As stated in the last cited case, at page 402, "Thus, the ultimate power of decision rests with the trial court." And, as declared in *Estate of Bristol* (1943), 23 Cal.2d 221, 223 [143 P.2d 689], on appeal from the judgment of the trial court, "The rule as to our province is: 'In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (Italics added.) (*Crawford* v. *Southern Pacific Co.* (1935), 3 Cal.2d 427, 429 [45 P.2d 183].) The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict. . . . Appellate courts, therefore, if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding." (See also *Estate of Teel* (1944), 25 Cal.2d 520, 526 [154 P.2d 384]; *Viner* v. *Untrecht* (1945), 26 Cal.2d 261, 267 [158 P.2d 3]; *Rice* v. *California Lutheran Hospital* (1945), 27 Cal.2d 296, 301 [163 P.2d 860]; *De Young* v. *De Young*

(1946), 27 Cal.2d 521, 526 [165 P.2d 457].) It follows that the question before us is whether the evidence, viewed in the light most favorable to petitioner, sustains the findings of the trial court to the effect that the charges against petitioner were not supported by the weight of the evidence.

As indicated hereinabove, the only evidence considered by the court was the record of the proceedings before the board, which included a transcript of the oral hearing. The accusation filed with the board charged that petitioner on certain dates in 1945 violated section 2301 of the Business and Professions Code in that at the respectively specified times, and otherwise than in "emergency treatment . . . or required by the presence of incurable disease . . . or the infirmities attendant on age," he prescribed narcotics for three alleged drug addicts, whom we designate here as Catherine (drugs prescribed between October 15 and December 11, 1945) ; Allan (drugs prescribed between October 22 and November 23, 1945) ; and R. L. (drugs prescribed on September 28 and on November 10, 1945). Petitioner freely admits that he did prescribe certain derivatives of opium to the persons named, but he contends, and the court found, that the weight of the evidence shows that petitioner's treatment of each patient was "emergency treatment . . . and that their condition at all times was complicated by the presence of an incurable disease," and that consequently the treatment was lawful and both legally and medically proper. Such contention of the petitioner and the finding and conclusion of the court in his favor are abundantly supported by the evidence.

Section 2391 of the Business and Professions Code provides that "the prescribing, . . . furnishing, . . . or administering . . . any of the drugs or compounds mentioned in section 2390 [which includes opium and morphine] to a habitue or addict constitutes unprofessional conduct within the meaning of this chapter [the chapter on medicine].

"If the drugs . . . are administered . . . by a licensed physician and surgeon of this State . . . this section shall not apply to any of the following cases :

"(a) Emergency treatment of a patient whose addiction is complicated by the presence of incurable disease. . . .

"(b) Treatment of habitues or addicts in institutions approved by the board [of Medical Examiners]. . . ."

And in section 11391 of the Health and Safety Code it is provided that : "No person shall treat an addict for addiction

except in one of the following: (a) An institution approved by the Board . . . [Four other types of institutions are here listed]. This section does not apply during emergency treatment or where the patient's addiction is complicated by the presence of incurable disease. . . ."

Petitioner testified that he is a graduate of Tulane University Medical School, served an interneship, and thereafter served as a medical officer in the United States Navy during World War II; that he had engaged in private practice from September, 1944, to October, 1945; that the alleged addict Catherine first came to his office, at Carmel, on October 13, 1945; that she was "complaining of severe pain in the left side of her face, and headache, and abdominal pain, and she told me that she had previously had trifacial neuralgia, which had been successfully injected, so I attempted to do the same thing over but the first time it did not work very well, so then I gave her some narcotics to take care of the pain"; that he continued treating her until December, 1945, and "prescribed a considerable amount of narcotic" because "it was evidently needed to control her pain"; that after he secured her history he was "treating her for an incurable disease, to-wit, tic douloureux and the trifacial neuralgias. . . . This trifacial, after it exists for some time, is quite difficult to control"; that he wrote to doctors who had previously treated the patient; that one of such doctors replied, under the date of October 24, 1945, that in 1928 he "did a left infra orbital injection for tic in 1928, which she [the patient] says was successful for six years. She now asks that I give you this information in the hope you will make another injection for her. She was then and is still, as far as I know, an addict." Petitioner further testified that he thereupon attempted (during the latter part of October, 1945) to secure admission to Las Encinas Hospital (which is approved by the board for the treatment of narcotic addiction) for the patient; that Dr. C. W. Thompson, medical director of the hospital, stated that no vacancies were then available, but upon inquiry from petitioner, replied that he (Dr. Thompson) thought that petitioner "would be allowed to give narcotics to this patient . . . as a humanitarian measure pending the time when the patient could be admitted for treatment"; that early in November he again "made a strenuous effort" to have the patient admitted to the same hospital but was again told that no vacancies existed; that he thereupon attempted to secure admission for

the patient into a different private hospital, also approved by the board for narcotic treatment, and also into the County Hospital; that when he finally ''got everything completed she refused to enter the hospital''; that the only money the patient ever paid him was for ''her telephone calls''; that he had a well established practice with a reasonable income at the time the patient consulted him. Petitioner stated further that on Catherine's first visit to his office he injected her face with novocaine and alcohol, and also prescribed morphine sulphate because sometimes such injections do not ''stop the pain''; that he had had no previous ''experience with narcotics [addicts]'' during his private practice; that on the occasion of Catherine's first visit to his office he did not know or suspect that she was an addict; that on examining her he observed a ''muscular tic'' or a ''tic douloureux'' on the ''whole left side of her face'' with frequent spasms; that such a tic is associated with a trifacial neuralgia; that his office history of the patient had been inadvertently destroyed by an inexperienced office assistant. Also introduced into evidence was a letter received by petitioner from the patient during the period he was attempting to secure her admission to Las Encinas, in which she described her years of suffering, including a history of pain from ''gall bladder, tri facial, and arthritis'' and expressed her appreciation for petitioner's kindness in attempting to help her. Much of petitioner's testimony as to Catherine's condition and her statements and appearance of being in great pain, as to petitioner's efforts to secure her admission to a hospital, and that petitioner was treating her primarily for trifacial neuralgia, was confirmed by his mother, a registered nurse and experienced anesthetist who assisted petitioner in his office. The mother testified further that Catherine ''haunted'' petitioner's office seeking treatment; that he prescribed for her until he ''could get her into an institution''; that the patient said ''she couldn't get the money'' for hospitalization, and when petitioner ''came to the conclusion that she had tried long enough to get the money he told her he couldn't treat her any longer, that she would have to go to an institution, and if she couldn't get the money for a private institution . . . she would have to go to the county, and I called the County Hospital and asked them to receive her and they said they would.'' Prescription forms introduced into evidence indicate that on 18 different dates between October 15 and December 11, 1945, petitioner prescribed morphine

sulphate for Catherine; thereafter petitioner discontinued treating the patient and on or about December 16, 1945, at the direction of another doctor she was "moved to a sanitarium" for treatment for withdrawal of narcotics.

Other prescriptions show that on nine dates between October 22 and November 19, 1945, petitioner prescribed morphine sulphate for the alleged addict, Allan. Petitioner testified that when he first examined Allan the latter "was in an acute asthmatic attack . . . choking . . . and I tried adrenalin and that didn't work. Then I started giving him Vitamin C and morphine and that seemed to hold him—control his symptoms"; that the only way petitioner "could control his symptoms was by the administration of Morphine Sulphate in large quantities"; that Allan was "to take these morphine sulphate tablets whenever he had an attack"; that Allan's history indicated "that he had had his asthmatic attacks for several years. . . . He told me he had an attack every twelve or twenty-four hours"; that "asthmatics normally have that terrific choking condition" and recurrence "so regularly" is "quite ordinary . . . depends entirely on changes of the weather and diet." Petitioner's mother confirmed that Allan first came in the office with an attack of asthma, "Practically choking and couldn't get his breath. . . . Every occasion he came in the office he was choking. . . This was no simulation." Dr. Harold E. Fraser, "Medical Examiner of the Courts of San Francisco," testified that he examined Allan in January, 1946; Allan told him of suffering so severely from chronic asthma that morphine treatment had been given; that he, the witness, believed Allan had asthma; that emergency treatment might require morphine; that morphine sulphate is recognized by some physicians as a proper prescription for chronic asthma.

Prescriptions indicate that on September 28, 1945, and again on November 10, 1945, petitioner prescribed pantopon, another opium derivative, for the alleged addict, R. L. Petitioner testified that he saw R. L. "about twice, maybe three times"; that petitioner administered narcotics "because of extreme pain and suffering in connection with a spinal arthritis" with which the patient was afflicted; that he (petitioner) did not consider R. L. an addict at the time but was "suspicious of him" and therefore inquired of the State Division of Narcotic Enforcement concerning the patient. Petitioner stated further that he believed he was treating all three of the alleged addicts

"for a pathology rather than addiction." An inspector from the Division of Narcotic Enforcement confirmed the fact that petitioner had inquired concerning R. L., on September 18, 1945, and had been informed the following day that "there was nothing on file at the office of the Division" concerning the patient. The inspector testified further that on November 13, 1945, petitioner had made a written report to the division concerning his prescription of narcotics for Allan in which petitioner stated Allan to be an addict, and on the same date made a similar report concerning Catherine; that from the reports "there was no indication that there was any dereliction on" petitioner's part; that in all his "dealings and conversations with" petitioner the inspector found petitioner "most cooperative."

The agent of the board, who filed the accusation against petitioner, also testified that when he questioned petitioner concerning the three alleged addicts petitioner "made a full and complete disclosure" and "did not appear to try to hold anything back."

It is apparent that the evidence summarized above amply supports the trial court's finding that petitioner's treatment of the three alleged addicts "was emergency treatment . . . and that their condition at all times was complicated by the presence of an incurable disease." Petitioner testified that in each case his treatment was for the purpose of relieving acute pain and suffering. ■ From the long history of Catherine's afflictions and the opinion of petitioner the court was warranted in the view that her condition was "complicated by the presence of an incurable disease," and it is common knowledge that some sufferers from severe cases of asthma and arthritis, the diseases of Allan and R. L., spend many years vainly seeking permanent relief and cure. The board points to evidence in the record which it urges establishes that petitioner was treating none of the three patients as an emergency measure or for a bona fide disease but solely for addiction. Such evidence at the most presents only a conflict with that discussed hereinabove. The trial court has resolved the conflict in petitioner's favor and under the rules already set forth its decision must stand.

■ As mentioned hereinabove, both the board and its individual members are named as respondents in the petition for mandamus, and the judgment rendered by the trial court is also directed to the board and to the persons of whom it is

composed, who are first named and then described as "Members of the State Board of Medical Examiners." The board contends that the members were improperly joined as parties respondent in that the board itself is the "only agency which may afford any relief or take any action in the matter." The board urges also that its membership changes from time to time and that undue labor and confusion will result if substitution of parties must occasionally be made in a court action involving the board. In support of its position on this point the board cites *Boland* v. *Cecil* (1944), 65 Cal.App.2d Supp. 832, 840 [150 P.2d 819] ; *Reed* v. *Molony* (1940), 38 Cal.App. 2d 405, 411 [101 P.2d 175] ; and *Sparks* v. *Prior* (1933), 131 Cal.App. 743, 744 [22 P.2d 233]. The first two of these cases are concerned with determining whether certain named defendants were sued as individuals or in their respective official capacities, and the statement in the third case, a proceeding to review an order of the Board of Dental Examiners suspending a dentist's license to practice, that only the board itself was a proper party defendant, is not accompanied by a citation of authority. It is our view that although the members of a board such as the Board of Medical Examiners need not necessarily (in the absence of special facts requiring their presence) be included as parties, it is not improper to name them in their official capacity, as was done here. As stated at page 857 (§ 58) of 16 California Jurisprudence, "Where the duty sought to be compelled is enjoined upon a board as such, the proceeding should be against the board, although the better practice seems to be to name the individual members in addition to the board. Moreover, there are exceptional cases in which the disobedience of the board is due to the action of certain individual members, where such members must be expressly made defendants, the reason therefor, appearing in the petition for the writ. Where the duty is enjoined upon particular officials as representatives of a body politic, the more general practice is to proceed against the officials, yet it is held that there is no good reason why their principal, the legal entity which is commonly the real party to be affected by the writ, may not be joined as a defendant in the proceeding; though seldom a necessary party, it may not generally be called an improper one." (See also *Golden Gate Bridge etc. Dist.* v. *Felt* (1931), 214 Cal. 308 [5 P.2d 585] ; *City and County of San Francisco* v. *Linares* (1940), 16 Cal.2d 441, 448 [106 P.2d 369] ; 35 Am.Jur. § 328, p. 80.) We hold that in the ab-

sence of legislative provision to the contrary the members of the board are proper, but not necessary, parties to this proceeding.

■ The board's motion to tax costs awarded to petitioner by the trial court was heard by a judge other than the one who rendered judgment in petitioner's favor; an order was entered taxing petitioner's costs at only $31.60 and disallowing the sum of $117 paid by petitioner to the reporter as the cost of the transcript of the proceedings before the board; and as stated hereinabove, petitioner has appealed from the order. As already quoted herein, section 1094.5 of the Code of Civil Procedure provides that in such a proceeding as this, "If the expense of preparing all or any part of the record has been borne by the prevailing party, such expense shall be taxable as costs."

Petitioner is the prevailing party; as appears hereinabove the record filed by him of the board proceedings is an authentic record, adopted by the board as a part of its return to the alternative writ; it is not disputed that petitioner bore the cost of preparing all of such record or that the amount paid is reasonable; it follows that his expense is taxable as costs and that the order taxing costs must be modified by adding the sum of $117.

In case No. L. A. 20514 the judgment from which the board appeals is affirmed. In case No. L. A. 20515 the order taxing petitioner's costs at $31.60 is modified by adding to such costs the sum of $117 and as so modified is affirmed.

Gibson, C. J., Shenk, J., and Carter, J., concurred.

TRAYNOR, J., Dissenting. — The procedure governing judicial review of the adjudicatory decisions of statewide administrative agencies is prescribed by section 1094.5 of the Code of Civil Procedure, which follows "the procedural pattern laid down by recent court decisions."[1] (Tenth Biennial Report of the Judicial Council of California, 26.) This section provides:

"(b) The inquiry in such a case shall extend to the question whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and

---

[1]*Dare* v. *Board of Medical Examiners,* 21 Cal.2d 790 [136 P.2d 304]; *Russell* v. *Miller,* 21 Cal.2d 817 [136 P.2d 318]; *Sipper* v. *Urban,* 22 Cal.2d 138 [137 P.2d 425].

whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.

"(c) Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence; and in all other cases abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."

Thus, the purpose of review under this section is the correction of abuse of discretion. "Where the fact finding power is involved, the review by mandate will correct an 'abuse of discretion on the facts.'" (Tenth Biennial Report of the Judicial Council of California, 141.) When the action of a local administrative agency is challenged, an abuse of discretion on the facts is established if the findings are not supported by substantial evidence. In the case of a statewide agency, with statutory powers only, the court may exercise an independent judgment on the facts, and an abuse of discretion is established if the court determines that the findings are not supported by the *weight* of the evidence. Thus, the controlling issue in a mandamus proceeding to review the action of a statewide agency exercising statutory powers only, when it is claimed that the findings are not supported by the evidence, is whether the findings are supported by the *weight* of the evidence. In some instances not yet clearly defined (*Dare* v. *Board of Medical Examiners, supra,* 21 Cal.2d 790, 799; *Russell* v. *Miller,* 21 Cal.2d 817 [136 P.2d 318]; *Wyatt* v. *Cerf,* 64 Cal. App.2d 732 [149 P.2d 309]; *Madruga* v. *Borden Co.,* 63 Cal. App.2d 116 [146 P.2d 273]; *West Coast Etc. Co.* v. *Contractors Etc. Board,* 68 Cal.App.2d 1 [155 P.2d 863]; *McDonough* v. *Garrison,* 68 Cal.App.2d 318 [156 P.2d 983]; *West Coast Etc. Co.* v. *Contractors Etc. Board,* 72 Cal.App.2d 287 [164 P.2d 811]) the court may accept evidence in addition to that presented before the agency. If it does, however, the basic issue in the case is still whether the *weight* of the evidence supports the agency's findings. Under section 1094.5 of the Code of Civil Procedure the superior court must find

that the *weight* of the evidence does or does not support the agency's findings. The question before the superior court is, not what findings it would have made had it been the administrative agency and the hearing had been held before it, but whether the agency abused its discretion by making findings that are not supported by the *weight* of the evidence. When an appellate court reviews the decision of the superior court it must determine whether the superior court correctly decided the issue before it, namely, whether the agency's findings are supported by the *weight* of the evidence. It cannot properly make that determination without reviewing the entire record to see where the *weight* of the evidence lies. If it considered the evidence only in part, it would not be determining where the weight of the evidence lies but only whether there is or is not some evidence on either side.

The majority opinion, however, is based on the assumption that the superior court is not acting as a reviewing court but as a trial court deciding issues of fact in the first instance as if there had never been an administrative hearing and as if the record made before the agency had been made before the court. Even though an appellate court reviewing the identical record of the administrative hearing that was before the superior court for review, concludes that the weight of the evidence clearly supports or does not support the agency's findings, as the case may be, it is bound by the superior court's decision as if the case were originally tried there, if there is conflicting evidence in the record. What special insight or qualifications does that court have to make its review of the identical record binding on the appellate court? Thus, the weight of the evidence test governs the superior court in reviewing the administrative record but not the appellate court in reviewing the decision of the superior court. The appellate court must blind itself to the fact that the proceeding before the superior court was a review of the administrative record and treat that proceeding as a trial de novo. Although the superior court must find that the agency's findings were or were not supported by the weight of the evidence, the appellate court is concerned, not with whether the superior court correctly decided that issue, but whether there is evidence to support the findings of the superior court, disregarding completely any question as to the weight of the evidence. The basic issue in the case, whether the agency's findings are supported by the weight of the evidence, is transformed into a

new issue essentially analogous to the issue in the case of a nonsuit or directed verdict. The appellate court must consider only the evidence in favor of the agency's findings, when the superior court finds that they are supported by the weight of the evidence, or only the evidence against such findings, when the superior court finds that they are not supported by the weight of the evidence.

The majority opinion by treating the proceeding before the superior court, not as a review, but as a trial de novo, reverts, so far as appellate review is concerned, to the doctrine of *Laisne* v. *State Board of Optometry,* 19 Cal.2d 831 [123 P.2d 457], from which this court withdrew in *Dare* v. *Board of Medical Examiners,* 21 Cal.2d 790 [136 P.2d 304] and *Sipper* v. *Urban,* 22 Cal.2d 138 [137 P.2d 425], and virtually makes the superior court the final reviewing court of the decisions of statewide administrative agencies exercising only statutory powers, when an abuse of discretion on the facts is claimed.

In *Sipper* v. *Urban, supra,* 22 Cal.2d 138, 144, Mr. Justice Schauer, who cast the controlling vote, declared:

"*The complete trial de novo doctrine of the Laisne case has been abandoned.* By the decision in the Dare case (*Dare* v. *Board of Medical Examiners, supra*) the majority of the court has receded from the extreme position taken in the Laisne case with respect to the right of a party to a complete trial de novo on mandamus review, and has thereby substantially rectified perhaps the most serious of the practical difficulties suggested in the dissenting opinion in the Laisne case as bound to be encountered in practice under the majority rule as then stated. The procedure as now declared gives the reviewing court the power and duty of exercising an independent judgment as to both facts and law, but contemplates that the record of the administrative board shall come before the court endowed with a strong presumption in favor of its regularity and propriety in every respect and that the burden shall rest upon the petitioner to support his challenge affirmatively, competently and convincingly. In other words, rarely, if ever, will a board determination be disturbed unless the petitioner is able to show a jurisdictional excess, a serious error of law, or an abuse of discretion on the facts. This is in full accord with the presumption declared in subdivision 15 of section 1963 of the Code of Civil Procedure, 'That official duty has been regularly performed.' It is, of course, also inherent in

the mandamus remedy that the right of the petitioner to the initial issuance of the writ is not absolute. His right to make the application is absolute but the application implicitly calls for the exercise of judicial discretion, and within the limits of that discretion (for definition of *judicial discretion, see Gossman* v. *Gossman,* 52 Cal.App.2d 184, 194-195 [126 P.2d 178]) the writ may be granted or withheld, as the facts averred in and circumstances appertaining to each particular case may require, in the interests of sound justice.''

It is now apparent that the rules that the ''record of the administrative board shall come before the court endowed with a strong presumption in favor of its regularity and propriety in every respect'' and that ''the burden shall rest upon the petitioner to support his challenge affirmatively, competently and convincingly'' have only such force as the superior court wishes to give them. Appellate courts abandon all responsibility for their enforcement.

The condition in this state of judicial review of the adjudicatory decisions of statewide administrative agencies exercising only statutory powers may be briefly described. Appellate courts disclaim virtually all responsibility when it is claimed that the agency's findings are not supported by the evidence. The superior court determines whether or not the writ shall issue, whether or not additional evidence shall be taken or a complete trial de novo given, and whether or not the agency decision shall be upheld or set aside. Whatever the superior court does must be upheld by the appellate courts if, viewing the proceeding not as a judicial review but as a proceeding like a nonsuit or directed verdict, there is some evidence or inferences therefrom in favor of the superior court's decision. Thus, on the one hand the superior court by refusing to issue the writ or by upholding the agency's findings, even though they are not supported by the weight of the evidence, may refuse to exercise the check on administrative agencies that the statute contemplates they should exercise. On the other hand, it has virtually unlimited freedom to destroy the effectiveness of such an agency. When it erroneously finds that the weight of the evidence does not support the agency's findings it substitutes its judgment for that of the agency and controls the discretion vested by the Legislature in the agency. (See, *Inglin* v. *Hoppin,* 156 Cal. 483 [105 P. 582]; *Doble Steam Motors Corp.* v. *Daugherty,* 195 Cal. 158 [232 P. 140]; *Bila* v. *Young,* 20 Cal.2d 865 [129

P.2d 364]; *Mosesian* v. *Parker*, 44 Cal.App.2d 544 [112 P.2d 705].) Judicial review becomes more than a check on administrative action, it completely supplants that action and destroys "the values—expertness, specialization and the like—which, as we have seen, were sought in the establishment of administrative agencies." (Report U. S. Attorney General's Committee on Administrative Procedure, 77.)

It is my opinion that the superior court in this case has erroneously found that the weight of the evidence does not support the board's findings.

Section 2391 of the Business and Professions Code provides:

"Unless otherwise provided by this section, the prescribing, selling, furnishing, giving away or administering or offering to prescribe, sell, furnish, give away or administer any of the drugs or compounds mentioned in section 2390 to a habitue or addict constitutes unprofessional conduct within the meaning of this chapter.

"If the drugs or compounds are administered or applied by a licensed physician and surgeon of this State or by a registered nurse acting under his instructions and supervision, this section shall not apply to any of the following cases:

"(a) Emergency treatment of a patient whose addiction is complicated by the presence of incurable disease, serious accident or injury, or the infirmities attendant upon age.

"(b) Treatment of habitues or addicts in institutions approved by the board where the patient is kept under restraint and control, or in city or county, jails or State prisons."

In an interview with Joseph W. Williams, a special agent of the board, on April 16, 1946, petitioner stated: "Katherine S . . . came to me about the middle of October, 1945 and she wanted narcotics. She said she had a trifacial neuritis. I prescribed morphine in ½ grain tablets, 20 tablets at a time. She claimed she had been treated for the trifacial condition in Ohio. I wrote her doctor in Ohio a letter. She claimed to have considerable pain in the face and needed a half grain every four hours.

"I prescribed for her for about a week before I wrote her doctor for a history of her case. I knew she was a narcotic addict and tried to talk her into going and taking the cure. I examined the cranial nerves, but did not make any x-rays.

"I gave her two injections of alcohol for her trifacial condition. One was given about a week after I began prescribing narcotics for her. The second was given some time in Novem-

ber. Those were the only treatments I ever gave her. The only other medicine I ever gave her was morphine.

"I prescribed a tube of ½ grain morphine tablets for her every three or four days. I have no case history of her in the office. I think I made one, but I think my attorney has it. She was going to sue me and I sent her file to my attorney. I don't recall whether I took a case history on her or not, but the only examination I made was the one of the cranial nerves of the face.

"I finally talked her into going to take a cure for narcotic addiction and contacted Doctor Thompson of Las Encinas Sanitarium at Pasadena and made arrangements for her to go there and take the cure for addiction, but she never went. Late in December, 1945, she went to Alexander's Sanitarium, Belmont.

"I prescribed narcotics for her from about the 19th of October up to about the time she went to Alexander's Sanitarium. I knew she was an addict but she claimed to have pain in her face and I more or less took her word for her pain, as I did not make very much of an examination.

"She gave the name of this Doctor in Ohio who was supposed to have treated her. I wrote to him but don't recall receiving any reply.

"I also prescribed narcotics for Allan G . . . from about the middle of October to the end of December, 1945. I have no chart for G . . . as I did not make a chart for him. He had asthma and I prescribed a tube of ¼ grain morphine at a time for him. His prescriptions were every three or four days apart also. When he first came to me he told me how much morphine he was using, and I thought it was a sufficient quantity to make him an addict. He stated he had been using this for a long time.

"At that time he was a cook on a ranch in Carmel Valley. I knew he was an addict and tried to get him to take the cure but he wouldn't do anything to help himself. He didn't want to take it. Although he had an asthmatic condition he did not need that much morphine for his asthma. The only reason he had to have morphine was because he was an addict.

"I gave him some Vm C for asthma, in addition to the straight morphine I prescribed for him. I did not make a chart or keep a history on his case.

"H. . . . was a cook at Pebble Beach School. I prescribed narcotics for him also for several months. He was supposed

to have duodenal ulcers, but I did not make any x-rays of him. I did a gastric analysis and decided he was a narcotic addict.

"I prescribed a tube of pantopon, ⅓ grain, at a time for him. I don't know how many prescriptions I wrote for him. I did not keep a record or history of his case, either. I was sure he was an addict when he first came to me, but I wrote prescriptions for him for narcotics.

"I also wrote prescriptions for Mrs. F. G. P. . . . . She claimed to have spinal arthritis. The next time she came in with gall stones. I prescribed 20 dilaudid, 1/16 grain. I never made any x-rays or kept any case history on her. She is supposed to be an addict."

The foregoing testimony was corroborated by another agent who was present at the interview.

The complete cross-examination of Mr. Williams follows:

"Q. Mr. Williams, the Doctor made a full and complete disclosure to you when you questioned him, did he not? A. I believe he did.

"Q. And he did not try to hold anything back? A. He did not appear to.

"Q. And when you speak of Mrs. Moran, that is the Doctor's mother, seated here in the room? A. Yes, the lady in black (indicating).

"Q. And at the time you made your notes, did you immediately reduce the conversation to writing or was there some lapse there? A. I wrote the original notes while sitting there at his desk.

"Q. Did you receive on this case a report from the Bureau of Narcotic Enforcement? A. Did I receive?

"Q. Yes. A. No, I did not.

"MR. ANDERSON: That is all.

"MR. HUTCHINSON: That is all. Thank you. Any question by any Board Member? (No response.)

(Witness excused.)"

The record reveals the following chronology of petitioner's treatment and prescriptions for these addicts:

### Katherine's Case

October 13, 1945—Petitioner's first meeting with addict. Examination and injection of novocaine and alcohol.

October 15, 1945—Prescription, morphine sulphate, 20 doses.

October 22, 1945—Prescription, morphine sulphate, 20 doses.

Katherine requested that the drug be taken by "hypo" because the taste of morphine was objectionable to her.

October 25, 1945—Prescription, morphine sulphate, 20 doses.

October 26, 1945—Petitioner received a letter dated October 24, 1945, reading as follows: "I have just received a letter from a patient of yours, Mrs. K. . . S. . ., formerly of Cincinnati, for whom I did a left infra obital injection for tic in 1928, which she says was successful for six years. She now asks that I give you this information in the hope you will make another injection for her. She was then and is still, as far as I know, an addict."

October 28, 1945—Prescription, morphine sulphate, 20 doses.

October 29, 1945—Prescription, morphine sulphate, 20 doses. Petitioner telephoned Las Encinas Sanitarium to have Katherine admitted as a narcotic patient.

October 31, 1945—Prescription, morphine sulphate, 20 doses.

November 2, 1945 — Prescription, morphine sulphate, 20 doses. Petitioner telephoned Las Encinas Sanitarium in a second attempt to have Katherine admitted as a narcotic patient.

November 10, 1945 — Petitioner sought to have Katherine enter the Livermore Sanitarium for treatment as a narcotic addict.

November 12, 1945 — Prescription, morphine sulphate, 20 doses. Petitioner telephoned Las Encinas Sanitarium in another further attempt to have Katherine admitted as a narcotic patient. Katherine refused to enter County Hospital.

November 13, 1945—First and only report to Narcotic Division on furnishing drugs to addict.

November 14, 1945 — Prescription, morphine sulphate, 20 doses.

November 16, 1945 — Prescription, morphine sulphate, 20 doses.

November 19, 1945 — Prescription, morphine sulphate, 20 doses.

November 21, 1945—Two prescriptions, morphine sulphate, 40 doses.

November 23, 1945 — Prescription, morphine sulphate, 20 doses.

November 24, 1945—Petitioner's last personal meeting with Katherine.

November 26, 1945 — Prescription, morphine sulphate, 20 doses.

November 30, 1945 — Prescription, morphine sulphate, *60* doses.

December 5, 1945 — Prescription, morphine sulphate, *60* doses.

December 11, 1945 — Prescription, morphine sulphate, 20 doses.

### Allan's Case

October 22, 1945—Prescription, morphine sulphate, 20 doses.

October 31, 1945—Prescription, morphine sulphate, 20 doses.

November 4, 1945 — Prescription, morphine sulphate, 20 doses.

November 10, 1945 — Prescription, morphine sulphate, 20 doses.

November 12, 1945 — Prescription, morphine sulphate, 20 doses.

November 14, 1945 — Prescription, morphine sulphate, 20 doses.

November 16, 1945 — Prescription, morphine sulphate, 20 doses.

November 19, 1945 — Prescription, morphine sulphate, 20 doses.

November 23, 1945 — Prescription, morphine, 20 doses.

### R. L.'s Case

September 28, 1945—Prescription, pantapon, 20 doses.

November 10, 1945—Prescription, pantapon, 20 doses.

The burden was upon petitioner to prove that the treatments were emergency treatments of patients whose addiction was complicated by the presence of incurable disease. (Code Civ. Proc., § 1981; *People* v. *Moronati,* 70 Cal.App. 17, 21 [232 P. 991]; *People* v. *Agnew,* 16 Cal.2d 655, 663 [107 P.2d 601]; *People* v. *Osaki,* 209 Cal. 169, 191 [286 P. 1025]; *Bebbington* v. *California Western States Life Ins. Co.,* 30 Cal.2d 157, 159 [180 P.2d 673]; see 21 Cal.Jur. 383, 384.)

During the hearing petitioner presented no expert testimony or opinion that his furnishing the narcotics was necessary or proper under the circumstances or in the light of the history and examination of any of the addicts. Clearly the deposition of Dr. Fraser and the letter from Dr. Thompson cannot serve to show emergency treatment of addicts whose addiction is complicated by the presence of incurable disease. Dr. Fraser, "Medical Examiner of the Courts of San Francisco," testified with respect to Allan's commitment proceeding for addiction.

On cross-examination he was asked by petitioner's counsel "Doctor, morphine sulphate is recognized by some physicians as a proper prescription for a chronic asthmatic condition, isn't that so? A. Oh, yes, it is used." He did not testify, however, that it was necessary or proper in Allan's case. When asked on direct examination "Are you able to state, Doctor, whether it would have been necessary in his treatment to have given him 20 one-half grains tablets for use during a week, for any condition that he then had?" he replied, "Well, that might be a moot question—that is almost an expert question to answer that. I think in the case of the treatment of asthma we don't like to use morphine in a chronic condition of that nature. However, I can see certain conditions where morphine had been used where it would be objectionable." He was then asked the question, "Morphine would not have any curative effect?—merely to alleviate the pain?" to which he replied, "No, merely to alleviate his distress."

Dr. Thompson, the medical director of Las Encinas Sanitarium was not available for cross-examination and his letter was introduced by his counsel "in mitigation of punishment, if any" and it was received by the hearing officer "as hearsay, as any other unsworn statement." The letter reads as follows:

"To Whom it may concern:

"This is to evidence and certify that Doctor James A. Moran of Carmel, California, called by telephone during the latter part of October, 1945, regarding one Mrs. S. . . ., stating that Mrs. S. . . was addicted to narcotics, and that he would like very much to have her admitted to Las Encinas for treatment.

"At that time we had no vacancies and could not confirm a reservation for this patient. Doctor Moran asked if I thought he would be allowed to give narcotics to this patient until such time as she could be admitted to Las Encinas for treatment, and *I replied that I thought this might be done as a humanitarian measure pending the time when the patient could be admitted for treatment.*

"Early in November, Doctor Moran phoned again, during my absence, and this time the conversation took place between Doctor Stephen Smith, Medical Director and Doctor Moran. Doctor Moran again stated the importance of treatment to Doctor Smith and again he was told that no vacancies existed and that we could do nothing about the matter for the present. *Doctor Smith also recognized the importance of Doctor Mor-*

*an's call and the urgency of supplying treatment to the patient,* Mrs. S. . ., but on account of lack of space, we were unable to admit Mrs. S. . . . for treatment.

"Respectfully, C. W. Thompson, M.D., Medical Director." (Italics added.)

There is nothing in this letter to indicate that Dr. Thompson or Dr. Smith believed that the heavy doses of morphine prescribed for Katherine were required as emergency treatment of an addict whose addiction was complicated by an incurable disease. The italicized statements in the letter, on which petitioner particularly relies, express the belief that pending Katherine's admission to the sanitarium for treatment for addiction petitioner might prescribe narcotics as a humanitarian measure. There was no approval, however, of the amounts prescribed, and petitioner cannot reasonably contend that he was treating her for addiction. The Health and Safety Code provides: "A physician treating an addict for addiction shall not prescribe for or furnish an addict more than any one of the following amounts of narcotics during each of the first fifteen days of such treatment: (a) Eight grains of opium. (b) Four grains of morphine." (§ 11392.) "After fifteen days of treatment the physician shall not prescribe for or furnish to the addict more than any one of the following amounts of narcotics during each day of such treatment: (a) Four grains of opium. (b) Two grains of morphine." (§ 11393.) "At the end of thirty days from the first treatment, the prescribing or furnishing of narcotics shall be discontinued." (§ 11394.) These restricted amounts are in sharp contrast with the heavy doses petitioner prescribed for Katherine. "The physician treating an addict for addiction shall within five days after the first treatment report by registered mail, over his signature, to the State division, stating the name and address of the patient, and the name and quantities of narcotics prescribed. *The report shall state* the progress of the patient under the treatment. The physician shall in the same manner further report on the fifteenth day of the treatment and on the thirtieth day of the treatment, and thereafter shall make such further reports as are requested in writing by the State division." (§ 11395.) There was no compliance with this provision.

There remains petitioner's testimony that in each case his treatment was for the purpose of relieving acute pain and suffering and that he believed he was treating the addicts

"for a pathology rather than an addiction." The record shows that the narcotics were furnished by prescription, apparently for use by each addict in his own way at his own time. They were furnished over periods as long as 58 days. None of the addicts was confined to bed. Each called regularly at petitioner's office for his own form of narcotics. There is no evidence of any physical examination of any of them after their first appearance at petitioner's office. It is not clear from the record to what extent, if any, petitioner saw them thereafter before furnishing them with prescriptions. The chronology set forth above shows that four prescriptions for 160 doses of morphine were furnished Katherine after petitioner last saw her on November 24, 1945. It is difficult to believe that it is emergency treatment to prescribe narcotics for an addict in such generous doses on so many occasions without even seeing her. (See, *People* v. *Kinsley*, 118 Cal.App. 593, 595, 601 [5 P.2d 938].)

The record shows that Katherine did not suffer from anything but narcotic addiction. Doctor Moultain saw Katherine at her sister's home on December 16, 1945, five days after petitioner's last prescription. He found no objective symptom of gall bladder ailment, of tic douloureux, or of other incurable disease, and concluded that her complaints "were purely for the purpose of getting morphine." She confessed to him that she was an addict and that "what she wanted was a dose of morphine." He caused her to be moved to the Alexander Sanitarium. Doctor Alden, the consulting psychiatrist at the Alexander Sanitarium, after examining the findings and history made by other members of the medical staff and the nurses' notes, and after conversing with Katherine, concluded that she was suffering from withdrawal of narcotics. He testified that there was no indication of any necessity for treatment for any other infirmity or disease. On January 12, 1946, Katherine was released from the Alexander Sanitarium as no longer requiring treatment.

In answering the contention that the board's findings should be set aside because of petitioner's testimony that his prescriptions were given to alleviate the pain of his patients suffering from incurable diseases, the District Court of Appeal, Second District, Division Two, which reversed the judgment of the superior court in this case, in an opinion by Presiding Justice Moore succinctly stated:

"But there was other proof upon that issue, to wit, the circumstantial evidence from which incriminating inferences may be drawn: (1) The excessively large number of doses given to S and G knowing that they were addicts. Although he knew that Mrs. S should be hospitalized for her addiction and attempted to gain her admittance into Las Encinas, he continued to prescribe the generous dosage to her for six weeks after that institution had rejected her and notwithstanding her refusal to enter the county hospital. Such prescriptions were clear violations of section 11391, *supra* [Health & Saf. Code] from which an inference of guilt might be fairly deduced and an adverse finding made under section 2391, Business and Professions Code. (2) He prescribed 180 doses for Mr. G for his asthma knowing that G was an addict and that morphine had no curative qualities. (See § 11393, *supra*.) He told a special agent that the only reason G had to have morphine was his addiction; that he 'did not know how many prescriptions' he wrote for him. Nor did he keep a record or history of his case. 'I was sure he was an addict when he first came to me, but I wrote prescriptions for him for narcotics.' After having already prescribed 100 doses for G, on November 13 he reported him as an addict to the division of narcotic enforcement giving his name, age, address, and dose; one and a half grains of morphine sulphate daily. (3) A similar report was made on November 15 with reference to Mrs. S after having already prescribed 180 doses for her subsequent to October 13. His failure to keep records and to make reports on both of these parties constituted violations of section 11395 and sufficed to justify the inferences of violations of that statute. (4) He prescribed twice for H, suspicious that he was an addict, before dismissing him. (5) He delayed reporting his prescriptions to the division of narcotic enforcement 'for quite some time.' (6) As further light upon his intent, petitioner prescribed for a Mrs. P, not mentioned in either count of the accusation, after being apprised by the division of her addiction. She claimed to suffer from arthritis, gall stones and spinal arthritis. He gave her '20 dilaudid, one half grains.' (7) In order to have a supply for his office he wrote prescriptions for morphine for his mother who served as his nurse.

"The board was not only entitled, but was required, to consider such circumstances in determining whether petitioner acted in good faith and honestly believed that each of the

addicts in question was suffering from incurable disease as well as from addiction. While the testimony of petitioner was direct and although he was the only person who could testify as to the thoughts he entertained, yet the circumstances particularized by him as well as those given by Doctors Moulton and Alden and by the special agents of the board, and his persistency in prescribing morphine for addicts when it could serve no purpose save that of gratifying appetites for the narcotic—these circumstances justify the inference of unprofessional conduct on the part of petitioner. And if in the minds of the members of the board such inferences outweighed the direct testimony of petitioner, the board was acting within its lawful discretion in suspending his license.''

It is hardly necessary at this time to argue the importance of the functions of the Board of Medical Examiners or the necessity of curbing the traffic in narcotics. The board, a body of 10 experienced physicians, interpreted the facts in the light of their professional training and experience, and determined that the condition of the addicts did not justify petitioner's supplying them with narcotics. The Legislature vested the board with power to make such determinations by virtue of its specialized experience, and this court has recognized that the ''findings of the board come before the court with a strong presumption of their correctness.'' (*Drummey* v. *State Board of Funeral Directors*, 13 Cal.2d 75, 85 [87 P.2d 848] ; *Dare* v. *Board of Medical Examiners*, 21 Cal.2d 790, 798 [136 P.2d 304] ; *Sipper* v. *Urban*, 22 Cal.2d 138, 144 [137 P.2d 425].)

Edmonds, J., and Spence, J., concurred.

Defendants and appellants' petition for a rehearing was denied August 26, 1948. Edmonds, J., Traynor, J., and Spence, J., voted for a rehearing.