[Civ. No. 17222. First Dist., Div. One. Mar. 14, 1957.]

THEODORE ROOSEVELT WILLIAMS, Appellant, v. INSURANCE COMMISSIONER OF THE STATE OF CALIFORNIA, Respondent.

Oliphant, Hopper & Stribling and Ralph E. Hopper for Appellant.

Edmund G. Brown, Attorney General, and Harold B. Haas, Deputy Attorney General, for Respondent.

BRAY, J.—The Insurance Commissioner after a hearing revoked petitioner's licenses to act as a bail agent, bail permittee and insurance agent. After a trial, and an independent weighing of the evidence originally before the commissioner, the superior court denied petitioner's application for a writ of mandate to annul the commissioner's decision. Petitioner appeals.

QUESTIONS PRESENTED

1. Sufficiency of the evidence and findings.*

2. The power of the commissioner to revoke petitioner's insurance license in addition to revoking his bail license.

1. EVIDENCE AND FINDINGS.

A recital of the evidence favorable to the court's findings shows that they are well substantiated, although in several instances, considering that evidence with petitioner's denials and evidence, the court, had it believed petitioner, could have found the other way.

1(a). *Motorola TV-Set Transaction.*

■ The accusation before the commissioner charged and the commissioner and the court (finding III) found that

---

*In cases of this type the trial court is authorized by law to exercise its independent judgment on the evidence. The court proceeding is in the nature of a trial de novo, and the record of the evidence before the administrative board is competent evidence before the court. On appeal from the trial court's judgment the only issue is whether the findings of the trial court were supported by substantial evidence. If there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, the doubt should be resolved in favor of the finding. (*Moran* v. *Board of Medical Examiners*, 32 Cal.2d 301, 308-309 [196 P.2d 20].)

petitioner accepted said set as security for payment of a bail surety undertaking premium, suspecting the set to have been stolen. It was stipulated that it was a stolen set. Petitioner admitted its receipt for the purpose mentioned. Petitioner contends that his actions, from which the commissioner and the court drew the inference that he must have known that the set was a stolen one, do not justify that inference.

Police officers came to his office one morning and told him that he had some equipment they wanted to look at, as they suspected it to have been stolen. With his permission they took back to the department a typewriter and an adding machine. Petitioner went with them. It was arranged that the officers were to go to petitioner's apartment that afternoon to see if he had other stolen property. One of the officers arrived at the apartment sooner than planned. Walking down the driveway, the officer saw petitioner come out of the apartment's back door, carrying the television set, and start up stairs leading to the second floor. The officer called to him and asked where he was taking it, and he said to one Davis. Petitioner's explanation of this was that after his visit to the police department, on returning he thought, "when I went to the office and they kept on after the investigation that morning, I started to thinking—what could I possibly have that I didn't know about, to be certain? And at that time I went through my mind—I rambled my brains right fast to think." He then thought of the fact that the person bonded had run away and "without thinking at all, I did move the T-V at that time—that was the end of it—. . . ." Petitioner admitted that Davis had not asked him for the set and further stated that he did not think Davis was home at the time, and that he had not figured how he was going to get into Davis' apartment, the door might or might not have been open. Petitioner conceded that he was getting the set out of the way before the officers arrived.

Petitioner's actions in attempting to remove the set before the anticipated arrival of the officers reasonably justifies the inference that petitioner knew or suspected that the set was a stolen one when he received it. An inference of this kind, reasonably drawn, constitutes substantial evidence. (See *People* v. *Lopez*, 126 Cal.App.2d 274, 278 [271 P.2d 874]; *People* v. *Bycel*, 133 Cal.App.2d 596, 599 [284 P.2d 927].)

1.(b) *The Clary Adding Machine.*

██ The accusation charged and the commissioner and

the court found (finding IV) that petitioner received and had in his possession a Clary adding machine, which he should have known was stolen property. As in the case of the television set, petitioner's attack is on the sufficiency of the evidence to show that he should have known it was stolen. Petitioner's claim was that this machine was a part of the equipment in the office when he took it over from his brother in January, 1952. He had witnesses to testify that they saw a Clary machine in the brother's office and then in petitioner's office from that time on, until taken by the officers. However, the machine was not stolen from its true owner until about March 20th. Petitioner also attacks the sufficiency of the evidence to show the identity of the stolen machine. However, this evidence is so strong as to not warrant detailing it here. Here, again, petitioner's actions, particularly in contending that both he and his brother had the machine in their possession at a time when it was still in the possession of its true owner, raises a reasonable inference that petitioner knew or should have known it to have been stolen, even though the Oakland police captain testified that they had not prosecuted petitioner because they did not think they had sufficient evidence.

1.(c) *The Branch Transaction.*

Both the commissioner and the court found that petitioner in violation of section 2102, title 10, California Administrative Code, failed to keep proper records, as required by that section (findings XII, XIII and XIV). Of the violations found two refer to the Branch transaction. Petitioner failed to keep proper records of (1) cash received, and (2) considerations other than cash received for bail bond premiums. Section 2102 provides: ''Every bail agent and bail permittee shall keep complete records of all business done under authority of his license. . . . These records shall be open to inspection or examination by the Commissioner at all times, at the principal place of business of the licensee. . . . Complete record of all business shall include the following: . . . (k) The date of each and every collection of premium or guard fee or service charge fees. . . . (r) If any valuable consideration other than money is received directly or indirectly as premium, guard fee or service charge or as any part thereof, a full statement of such consideration and the circumstances attendant thereto.''

Branch paid petitioner $175 on account of a $600 bail bond premium. The Department of Insurance investigator Jordan

found no entry of any payment in petitioner's "Receipt and Statement of Charges." On questioning petitioner about the amount paid by Branch petitioner told him $60. Later on, again examining the above mentioned receipt, Jordan found that the figure of "$425" had been inserted as a balance. Petitioner then told Jordan he had received $135 on the account, but could not reconcile the conflict between the stated premium of $600, the balance due of $425, and the amount of $135 he claimed to have received. Jordan found a notebook of petitioner's which indicated that petitioner had received more money than he admitted receiving. Although not shown to the investigator or present at petitioner's place of business, petitioner claims that a little black book containing the proper figures which he produced later, and his explanation that he was merely careless in his manner of keeping accounts, showed no violation of section 2102. Both the commissioner and the trial court were justified in thinking otherwise. In addition to cash payments, Branch gave petitioner a bill of sale to, and physical possession of, a washing machine and a combination television set as security for the payment of the balance of the premium. Petitioner still has these articles in storage, never having foreclosed his security by sale or otherwise. No reference of any kind appears in petitioner's records concerning this security. ▆ Petitioner contends that section 2102 does not require the entry of a security transaction until the security is foreclosed. This contention completely disregards the language of subdivision (r): "If any valuable *consideration other than money* is received directly *or indirectly* as premium, guard fee or service charge or as any part thereof, *a full statement of such consideration and the circumstances attendant thereto.*" (Emphasis added.) Obviously property put up as security for the payment of premium is received at least "indirectly" for the latter purpose.

1.(d) *The Grundy Transaction.*

▆ Petitioner claims that Grundy paid him $125 as a bail bond premium. He had a miscellaneous collection of records, a file card, a set of "debt cards," a "Money Received Book Moore Rediform," (this was a book containing numbered receipts), a "Receipt and Statement," bail bond documents, and a copy of an order exonerating bail, which copy alone showed the amount of $125 as still owing. In none of the records is the payment shown. Petitioner produced a receipt stub in another receipt book which he used for miscellaneous purposes including some bail matters. This stub purported to show

payment of the $125, although it is dated a year later than when petitioner claims to have received the money. Petitioner claimed that the year date on the receipt was merely a clerical error. Thus there was substantial evidence to support the court's findings that petitioner did not keep the records required by section 2102.

1.(e)  *The Miller Transaction.*

The court found (findings XIV and XV) that petitioner failed to keep a proper record of a bail bond transaction with one Miller, and that petitioner fraudulently represented to one Walter C. Lea when he transferred the Miller account to Lea for collection that the amount due was $200 when in fact it was only $100. Lea paid $150 for the account. Miller testified that the total premiums on his bail bonds came to $400. One payment was by a $200 check of Miller's mother-in-law on which she had written "Balance Bail C. C. Miller." Petitioner claimed that Miller owed him money on a personal transaction and that he credited this sum on that account. Had this check been credited on the premium account the amount due from Miller at the time petitioner sold the account to Lea would have been only $100.

It is petitioner's contention that Miller owed him on the premium account and the personal account together $200 or $250, and hence there was no fraud in representing to Lea that Miller owed him $200 on the premium account. As petitioner puts it, "Miller actually owed appellant a minimum of $200 and *possibly* $250 as claimed by Appellant." (Emphasis added.) It is rather interesting that although petitioner is not quite sure whether at that time Miller's total indebtedness to him was $200 or $250, no record of this additional transaction appears in petitioner's records. The evidence supporting the findings of both the commissioner and the trial court on this subject is substantial.

1.(f)  *The Farkas and Hall Transactions.*

■■  The accusation charged and both the commissioner and the court found (finding XI) that petitioner solicited Farkas to sell him stolen clothing and that petitioner held himself out to Farkas as ready, willing and able to buy and receive stolen clothing, and further that on 18 different occasions Hall contacted petitioner regarding dealing in stolen property and each time petitioner expressed willingness to procure certain stolen property for delivery to Hall or to otherwise accept or deal in stolen property. No purpose would be served in detailing the evidence. It resolved itself pri-

marily into questions of credibility between police officers, Farkas and Hall on the one side, and petitioner and his wife on the other. Both the commissioner and the trial court believed the officers. Such actions of petitioner were of the type which warranted the finding that the commissioner was entitled to revoke petitioner's license under the provisions of section 1806: ''The commissioner may suspend, revoke or refuse to issue any license under this chapter whenever it is made to appear to him that the holder of such permit is not a fit or proper person to be permitted to continue to hold or receive such license.''

*Stoumen* v. *Reilly*, 37 Cal.2d 713 [234 P.2d 969], cited by petitioner, is not in point. There it was held that a liquor license could not be taken from a restaurant merely because it was a ''hangout'' for homosexuals who in nowise committed any illegal or immoral acts there. Here petitioner's acts were criminal in nature—the solicitation of ''another . . . to commit or join in the commission of . . . receiving stolen property . . .'' (Pen. Code § 653f.) Such acts showed petitioner to be not fit to hold a bail bond license, particularly as most of the patrons of a bail bond licensee are of the criminal element.

1.(g)   *Other Findings.*

Included in finding XI was a finding to the effect that petitioner had falsely stated to Jordan, a representative of the commissioner, and to Oakland police personnel, in the course of a lawful investigation of petitioner's books, that the Clary adding machine was a part of the equipment acquired by petitioner from his brother. This portion of the finding is supported by the evidence which we have heretofore discussed and was used as a basis for additionally determining that petitioner was not a fit person to hold a license. The trial court further found and the evidence supports the findings, that because of the matters hereinbefore discussed petitioner does not have a proper understanding of the obligations and duties of bail, has demonstrated incompetency and dishonesty, untrustworthiness in the conduct of his bail business, and constituted cause for disciplinary action under the provisions of the Insurance Code. The evidence fully supports the trial court's action.

2.   THE INSURANCE LICENSE

The most serious question raised is whether the conduct of petitioner, while directly cause for revoking his bail license

under the provisions of the Insurance Code expressly dealing with bail bond licenses, also justifies the revocation of his insurance license under the provisions of the Insurance Code giving grounds for the revocation of insurance agents' licenses. An examination of the code shows that while the grounds for revoking an insurance license are directly made applicable to bail licenses, the reverse is not so direct. Revocation of bail licenses is expressly provided for in sections 1805, 1806, 1807, 1812 and 1813 in division 1, part 2, chapter 7, article 1. No other licenses are included in that chapter. Section 1731 in division 1, part 2, chapter 5, article 3, provides the grounds for revocation of insurance licenses. While section 1731 does not list bail licenses, section 1821 in chapter 7 provides that the provisions of section 1731 shall apply to bail licenses and bail licensees. The only section adapting any provision of chapter 7 to insurance licenses is section 1731, subdivision (g). Thus, our problem is whether petitioner's acts support the conclusions of the commissioner and the court that those acts violated subdivisions (d), (e) and (g) of section 1731.*

The acts for which petitioner was found to have violated these subdivisions are, failure to keep proper records of bail transactions, accepting as security in a bail transaction property which petitioner suspected or should have known was stolen property, receiving other property which he should have known was stolen property. The records which were improperly kept related exclusively to bail transactions as did the receiving of stolen property as security, and neither related directly to insurance records or matters. The receiving of other stolen property was not necessarily related to bail matters nor directly related to insurance matters. Whether section 1731, subdivisions (d) and (e), apply here does not necessarily depend upon whether the word "business" as used in those subdivisions applies to petitioner's insurance business alone or whether it includes all of his business which was bail and insurance both. ■ We are convinced that in view of the provisions of section 1731, subdivision (g), hereafter

---

*At the time of the commissioner's decision these provided: "(d) Such person has engaged in a fraudulent practice or act or conducted his business in a dishonest manner. (e) Such person has shown incompetency or untrustworthiness in the conduct of his business or has by commission of a wrongful act or practice in the course of his business exposed the public or those dealing with him to the danger of loss. . . . (g) Such person has failed to perform a duty expressly enjoined upon him by a provision of this code, or has committed an act expressly forbidden by such a provision." (Stats. 1953, p. 679.)

discussed, the fact that petitioner kept proper insurance records would not deny the commissioner the power to revoke the insurance license for failure to keep proper bail records. What of the situation where petitioner who combines bail and insurance businesses, is a receiver of stolen property, suspecting it to be stolen, or under circumstances from which he should have known it to be stolen? Can it be said that while engaged in a part of a joint business he is engaged in a fraudulent practice, does business in a dishonest manner (§ 1731, subd. (d)), has shown untrustworthiness and by commission of wrongful acts and practices has exposed the public or those dealing with him to the danger of loss (§ 1731, subd. (e)), but as to part of that joint business he is just the contrary and is honest and trustworthy? To ask the question is to answer it. The whole business is necessarily tainted with his acts in part of the business. Section 1649, subdivision (b), dealing with the issuance of insurance licenses, requires that the granting of the license shall not be against public interest. In determining the questions arising in this case, they should be viewed from the standpoint that the holding of a license should not be permitted to continue when it appears that the acts of the holder are against public interest. The situation is somewhat analogous to that considered in *Geibel* v. *State Bar*, 11 Cal.2d 412 [79 P.2d 1073], where the contention was raised that the California Supreme Court had no jurisdiction to discipline an attorney for unprofessional acts in federal court litigation. That court held that it had such jurisdiction and suspended the licenses to practice of the attorneys involved.

Section 1731, subdivision (g), applies to a person who has failed to perform a duty expressly enjoined upon him by a provision of the Insurance Code or committed an act expressly forbidden by such a provision. This subdivision is not limited to duties required under chapter 5 which deals primarily with insurance licensees, but refers to duties required anywhere in the entire Insurance Code. Thus, a person holding an insurance license who, having also a bail license, violates any requirements of chapter 7, the bail license chapter, may be disciplined under section 1731, subdivision (g). Section 1805, subdivision (d), requires that a bail licensee "has not participated in or been connected with any business transaction which, in the opinion of the commissioner tends to show unfitness to act in a fiduciary capacity or to maintain the

standards of fairness and honesty required of a trustee or other fiduciary." The evidence shows that petitioner has violated that requirement.

Section 1812 provides that the commissioner "may make reasonable rules necessary, advisable, or convenient for the administration and enforcement of the provisions of" chapter 7. Pursuant thereto, sections 2089 and 2102, among others, California Administrative Code, title 10, were adopted. Section 2089 provides that no bail licensee shall charge or collect in any bail transaction any sum in excess of the premium and other charges there permitted. The Branch transaction shows and the commissioner found that petitioner violated that section. Section 2102 provides that every bail licensee shall keep complete records of all business done under the authority of his license, which records shall be open to the commissioner at all times and shall include, among other matters, (k) "The date of each and every collection of premium or guard fee or service charge fees," and (r) a statement of any consideration other than money received directly or indirectly as premium or fee. The evidence amply supports the commissioner's finding that petitioner did not keep such records. Therefore, petitioner "failed to perform a duty expressly enjoined upon him by a provision of this code" and "has committed an act expressly forbidden by such a provision." (§ 1731, subd. (g).)

Section 1639 provides that the purpose of chapter 5 "is to protect the public by requiring and maintaining professional standards of conduct on the part of all insurance" licensees. The evidence clearly shows that petitioner violated those standards.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 8, 1957.