Filed 5/29/15  Shadowview Corp. v City of Victorville CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| SHADOWVIEW CORPORATION, | |
| Plaintiff and Respondent, | E060404 |
| v. | (Super.Ct.No. CIVDS1310452) |
| CITY OF VICTORVILLE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  David S. Cohn, Judge.  Reversed.

Green, De Bortnowsky & Quintanilla, Andre de Bortnowsky, Charles R. Green, Jennifer A. Mizrahi and Staley Prom for Defendant and Appellant.

Roger Jon Diamond for Plaintiff and Respondent.

I

INTRODUCTION

In August 2013, the City Council of the City of Victorville, appellant, upheld a

1

planning decision to revoke a conditional use permit (CUP) and a business license for the nightclub T/Zers Sports Bar and Grill, which was operated by respondents Shadowview Corporation (Shadowview) and George Thanos (collectively T/Zers). The City now appeals from the superior court's grant in November 2013 of a petition for writ of administrative mandamus, directing the City to set aside its revocation decisions and allowing T/Zers to continue operating. (Code Civ. Proc., §§ 904.1, subd. (a)(1), and 1094.5, subd. (h)(3).) Although we think the appeal is largely moot, we reverse the judgment.

II

MOOTNESS

During the past few years, T/Zers has been the site of numerous crimes, including homicide. In July 2013, the City's planning commission revoked the CUP and the business license, which are required to operate a nightclub within 300 feet of a residence. The planning commission's grounds for revocation included findings that the operation of T/Zers was a nuisance[1] and was contrary to the peace, health, safety, and general

---

[1] The Victorville Municipal Code (VMC) section 13.02.130 defines nuisance to include "a thing, act, occupation or use of property which does any of the following: (a) [a]nnoys, injures, or endangers the safety, health, comfort or repose of the public: [¶] . . . [¶] (c) [i]n any way renders the public insecure in life or in use of property." All references to the VMC are to the version in effect in 2013.

welfare of the public. In August 2013, the city council upheld the planning commission's findings and the revocations.

T/Zers filed a petition for writ of administrative mandamus, seeking to set aside the revocations. The trial court granted the writ without prejudice, on the grounds the findings were not supported by the evidence, and directed the City to set aside its revocation decisions. On appeal the City argues the trial court's decision was not supported by substantial evidence and should be reversed.

We take judicial notice of the fact that the City revoked the CUP and license again in October 2014 so T/Zers is once again closed, apparently permanently.[2] (Evid. Code, §§ 852, 859.) We asked the parties to submit supplemental briefing on the grounds that, even if we reversed the judgment, the City has already completed the second revocation proceeding in October 2014 and the nightclub was closed again. All we would be deciding in this appeal is whether the nightclub should have been allowed to reopen between November 2013 and October 2014, a period of time which has now expired. For that reason, we still deem the issues in this case to be virtually moot.

Both parties seem to be hoping for vindication of their positions. Even though T/Zers is not the appellant and would prevail here if we should dismiss the case as moot, it seeks to have an appellate decision on the merits in its favor that, presumably, it can

---

[2] It would have been helpful for the City to have supplied this information to the court while the appeal was pending.

wield as a tool in future proceedings should they occur. The City, as appellant, urges the appeal should be entertained because it involves an issue of public interest likely to recur and because there is a material question about whether the trial court employed the proper standard for reviewing an administrative review. We are not convinced by these arguments. Even if we reverse the judgment, the pertinent issue is whether the second revocation was proper based on findings made on whatever additional evidence was developed between November 2013 and October 2014. That is not a matter for this court to decide in this appeal. However, in the interests of justice, we will review the matter.

After reviewing the record, we conclude there was not substantial evidence to support the trial court granting the writ, which was only effective from November 2013 to October 2014. We reverse the judgment.

III

FACTUAL AND PROCEDURAL BACKGROUND

The nightclub was located at 14269 Seventh Street in Victorville, with daily hours of operation between 11:00 a.m. and 2:00 a.m. In 2005, T/Zers received approval for CUP No. 92-049(M) and a business license, BSL05-07398.

A. *The Planning Commission Hearings and Revocations*

At the planning commission meeting on April 10, 2013, Deputy Sheriff William Hogan raised a concern about the nightclub, which had generated 470 calls for service in the previous 18 months. Deputy Hogan stated that the police had to be present in the parking lot at closing time to avert trouble and that the operation of T/Zers had been

4

disrupting other local businesses, and depleting sheriff's department resources. The managers of two nearby restaurants—Richie's Diner and Denny's—complained their businesses had been adversely affected by the nightclub's drunken patrons, causing them to lose money, customers, and staff.

The City began proceedings to revoke the CUP and the business license in April 2013. The notice of public hearing announced: "Numerous issues occur at the location on a regular basis, resulting in the business being a nuisance and causing a threat to the health and safety of residents, customers and neighboring businesses." The present owners of the property occupied by the nightclub, William J. and Shoshana Simon, were not opposed to revocation because of the many problems. The public hearing, originally scheduled for May 8, 2013, was continued twice.

The May 2013 planning commission staff report, included the following information: "The Sheriff's concerns include an extremely high number of service calls to the location; the severity of the calls; the impact to the community due to the amount of deputies responding to the location; the potential danger to the safety of the deputies; and the impact to the surrounding businesses and properties." The nightclub caused a drain on police resources. It had a history of over 900 service calls between May 2008 and May 2013, including vandalism, indecent exposure, public disturbance, petty theft, drug crimes, assault, battery, rape, attempted murder, and two homicides. Other crimes were resisting an officer, public drunkenness, threats, brandishing a weapon, discharge of a firearm, carjacking, and domestic battery.

The report further stated: "The severity of the crimes endangers numerous people, including the customers of the bar, the officers who are at the scene, surrounding residents, and neighboring businesses and their customers. . . . The drunken patrons from the bar go to these restaurants where they harass the employees, skip out on paying for meals and drive away customers passing through on the freeway. These businesses have had financial losses and have lost employees who do not want to work the night shift due to T-Zers bar."

The report also described the problematic history of George Thanos and his operation of other bars since 1993. The Department of Alcoholic Beverage Control (ABC) and the fire department were investigating other violations and unsafe conditions involving signage, graffiti, poor lighting, litter and debris, unmarked fire lanes, electrical wiring and extension cords, fire extinguishers, exits, railings, ducts, and other hazards.

At the hearing on May 29, 2013, several individuals spoke both for and against the revocations, including patrons and employees of T/Zers, an adjacent property owner, and other interested persons. The hearing was continued again until July 10, 2013, to allow T/Zers's attorney, Richard Ewaniszyk, additional time to prepare.

On June 11, 2013, the city attorney, Andre de Bortnowsky, met with Thanos and his son, Ewaniszyk, City staff, and Deputies Hogan and Waterhouse to attempt to resolve the problems at T/Zers. Several recommendations were made but never implemented.

In the July 2013 hearing, the City's Director of Development made a presentation, discussing again how the service calls involved some major crimes, and were a drain on

6

City resources, as well as addressing the poorly maintained premises and the impacts to neighboring businesses. Deputy Hogan discussed the extremely high number of service calls, the severity of those calls, safety violations, and other disrepair at the premises. T/Zers's attorney made a presentation, arguing that the significant service calls were less than 400 and the history for other businesses was comparable to the history for T/Zers. He attempted to minimize the severity of crimes on the premises and disputed the problems experienced by the nearby businesses, Richie's Diner and Denny's.

After considering all of the evidence received on May 29 and July 10, 2013, the planning commission made several findings, including that numerous violations of the City's business license code had occurred; that T/Zers had been conducting business "in a manner that is contrary to the peace, health, safety and the general welfare of the public over a number of years," thereby violating the VMC; that its conduct had "consistently proven to be a nuisance" as defined in VMC Section 13.02.130, and was detrimental to "the public's health, safety and welfare," as evidenced by the amount and types of crimes and the testimony given by neighboring business owners. The findings are explicitly stated in Resolution No. P-13-013, which approved revoking the CUP, pursuant to VMC section 16-3.02.090, and the business license, pursuant to VMC section 5.04.310(6).

B. *The Appeal of the Planning Decision*

T/Zers immediately appealed the planning decision, arguing it had not received due process and the planning commission had disregarded its vested property rights. On August 6, 2013, the city council conducted a hearing on the appeal. The city council was

provided with all previous materials. In addition, the city council had a letter from an adjacent property owner, Alex Rickards, in favor of denying the appeal. The development and sheriff's departments submitted a written response to the claims of error, in which they disagreed that T/Zers was denied due process or deprived of a vested property right. After a hearing at which T/Zer's attorney made a lengthy argument, the City adopted a resolution denying the appeal, based on substantial evidence, and upholding the revocation of the CUP and the business license. Without a CUP or business license and CUP, T/Zers was prohibited from carrying on any business. T-Zers closed in August 2013.

## C. *Petition for Writ of Administrative Mandamus*

On August 29, 2013, T/Zers filed a petition for writ of administrative mandamus against the City, seeking a peremptory writ setting aside the revocations, and compelling the City to reinstate the CUP and business license. On September 3, 2013, petitioners filed an ex parte application for stay of the administrative decisions. After the City filed opposition with supporting declarations, the court denied the ex parte application.

Subsequently, petitioners filed a notice of motion for order granting writ of administrative mandamus or, in the alternative, for a temporary stay. Because the City had not yet finished compiling the administrative record, it filed an ex parte application seeking additional time to respond. The court ordered the City to complete and file the administrative record. The City also filed opposition to petitioners' motion for a temporary stay on the grounds that (1) the court had already denied T/Zers's ex parte

8

application for a stay, and (2) notwithstanding, a stay could not be granted under Code of Civil Procedure section 1094.5 because it would be against the public interest. The court denied the request for a temporary stay and continued the hearing on the writ to November 22, 2013, to give the court time to review the administrative record.

On October 24, 2013, the City filed the administrative record. The City also filed additional opposition to the writ petition, arguing T/Zers had received a fair hearing and full due process; ample evidence supported the City's findings, including that T/Zers was a public nuisance, as that term is defined in the VMC; and the City's findings, both at the planning commission and city council levels, were proper under applicable case law. T/Zers filed its reply memorandum, again arguing substantial evidence did not support the City's findings.

The court conducted a hearing on November 22, 2013. The court found there was not enough evidence to support the administrative findings and the findings were technically deficient. The court granted the writ, without prejudice. Apparently, the nightclub reopened until October 7, 2014, when the City again revoked the CUP and business license by adopting Resolution No. 14-028.

IV

DISCUSSION

A. *Standard of Review*

The relevant portions of Code of Civil Procedure section 1094.5 provide that an abuse of discretion may be established (i) if the agency has not proceeded in the manner

9

required by law, (ii) if the order or decision is not supported by the findings, or (iii) if the findings were not supported by the evidence. T/Zers challenged the City's administrative decision, claiming that the hearing before the city council was not conducted properly, that the planning commission and city council abused their discretion in that they did not have sufficient evidence to support their findings and conclusions, and that the findings were inadequate. The superior court considered whether the findings were adequate and whether the findings were supported by the weight of the evidence. The court exercised its independent judgment, given the fundamental rights at stake. (*Woodward v. Personnel Commission* (1979) 89 Cal.App.3d 552, 556; *Goat Hill Tavern v. City of Costa Mesa* (1992) 6 Cal.App.4th 1519, 1525.) The court commented that, even if the findings were adequate under *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, the findings were not supported by the evidence.

In cases involving the use of independent judgment, the trial court must afford a strong presumption of correctness to the administrative findings, and the party challenging the administrative decision bears the burden of proving that the findings are incorrect—that is, the findings are contrary to the weight of the evidence. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 816-817.) On appeal, when reviewing cases in which the trial court used the independent judgment test to determine whether the agency's findings are supported by the evidence, the appellate court reviews the trial court's decision under the substantial evidence test. (*Id.* at p. 824; *Bledsoe v. Biggs Unified Sch. Dist.* (2008) 170 Cal.App.4th 127, 134; *Moran v. Board of Medical*

10

*Examiners* (1948) 32 Cal.2d 301, 308.)  Substantial evidence is that which "amply supports" the trial court's findings.  (*Moran,* at p. 313.)

B.  *Sufficiency of Evidence to Support City's Findings*

The evidence in the record does not amply support the trial court's ruling.  Instead, the evidence supports the City's findings that T/Zers was a nuisance and a public threat.  T/Zers did not overcome the presumption of correctness to be accorded the City's findings.

Between April and July 2013, the planning commission afforded T/Zers ample opportunity and notice to contest the revocations.  The City's findings were supported by the extensive amount of evidence presented by the planning commission.  The planning commission was not required to comply with "[f]ormal rules of evidence or procedure applicable in judicial actions and proceedings . . . ."  (Gov. Code, § 65010, subd. (a); VMC §§ 17.108.010-17.108.050 (lack of any formal evidentiary requirements).)

Among the City's findings were that T/Zers had committed numerous business license code violations (VMC § 5.04), the most serious of which was conducting business in a manner contrary to the peace, health, safety, and general welfare of the public over many years.  The grounds for revocation of a business license include that the business is presently a public nuisance; or the business is detrimental to public health, safety, or welfare or a nuisance.  (VMC §§ 5.04.110; 5.04.310; 13.02.130; 16-3.02.090.)  Ample evidence in the administrative record supported numerous findings, providing several independent grounds upon which to revoke the CUP and business license.

11

The City found that T/Zers generated an extremely high number of service calls which endangered numerous people—including customers, responding officers, surrounding residents, and neighboring businesses and their customers. T/Zers generated over 900 calls for service in five years and 55 calls for service between May 1 and July 10, 2013. The sheriff's department compiled reports of repeated criminal activity—including shootings, stabbings, homicide, attempted murder, rape, assault with a deadly weapon, domestic violence, assault, battery, indecent exposure, petty theft, and drug crimes. The military expressed concerns about the safety and welfare of military personnel. Additionally, the photographic evidence presented by the sheriff's department showed trash, graffiti, and poorly maintained facilities on the premises, including insufficient lighting and exposed wires. Deputy Hogan testified that he had observed expensive liquor bottles littering the premises, presumably from T/Zers, and not from homeless persons.

The fire department identified many unsafe conditions, including unsafe electrical cords, a hole in the ceiling, illegal latching devices on a door, inoperative emergency lighting and fire extinguishers, and an exit door in need of repair. The ABC observed violations involving graffiti, exterior lighting, and litter. The evidence confirmed there was no successful effort to remedy the fire code violations, including the expired fire extinguisher, inoperative emergency lighting, and unsafe electrical cords. There was also an inadequate number of security guards, inadequate parking lot lighting, unsanitary conditions, and untrained bartenders.

12

The evidence fully supports the City's findings that T/Zers had a negative impact on surrounding businesses and property. Neighboring businesses and property owners, including Denny's and Richie's Diner, reported witnessing violence, hearing shootings, and experiencing problems caused by drunk patrons. The present property owner complained about drunk and disorderly vagabonds and the nightclub's poorly-maintained facilities, including observing a cat's litter box in the kitchen oven and a hole in the roof covered by a mixing bowl. The same evidence supported findings that T/Zers's conduct was a nuisance, as defined in VMC section 13.02.130, that rendered the public insecure and violated the standards of a CUP as discussed in VMC sections 16.02.010 and 16.02.050.

T/Zers also violated City rules for business licenses. T/Zers's business license was not posted, as required. Thanos was listed as T/Zers's agent of service but was not listed or shown on the business license.

In contrast to the vast amount of evidence supporting the findings that T/Zers is a nuisance and has been conducted in a manner contrary to the peace, health, safety and the general welfare of the public, there was only a minimal amount of contradictory evidence presented by T/Zers. A security guard claimed improvements had been made in maintenance and safety. Another nightclub employee testified that safety had improved. However, in the two months before revocation, there were 55 calls for service including for one assault, two stabbings, one shooting, one weapons charge, and nine various disturbances. There was also evidence that litter and trash in the parking lot continued to

13

be a problem and Deputy Hogan observed the same dangling electrical wiring in the parking lot the day before the July 10th revocation. The sheriff's department provided photographs showing other continuing violations. T/Zers did not refute the evidence that the nightclub constituted a nuisance and was a threat to health, safety, and welfare.

Instead T/Zers's attorney tried to minimize the significance of the service calls but he did not refute the fact that numerous, repeated, dangerous criminal incidents had continued to occur. Information about service calls for other businesses was not relevant as to whether T/Zers was a nuisance. Whether other businesses generate greater or fewer calls did not rebut the City's findings that T/Zers generated a high number of service calls and constituted a nuisance. There was little evidence to overcome the presumption that the City's findings were supported by substantial evidence. (*Fukuda v. City of Angels, supra,* 20 Cal.4th at pp. 816-817.)

*C. Goat Hill*

It is clear from the record that the great weight of the evidence did in fact support the City's findings that T/Zers was a nuisance and was a serious threat to peace, health, safety, and welfare. However, respondent argues that *Goat Hill* supports the superior court's decision with respect to the City's findings. The quantity and quality of evidence is vastly different. Here, no substantial evidence supported the superior court's decision to grant the writ.

In *Goat Hill*, the appellate court found that, while the city had presented evidence of complaints from neighboring residents and businesses, there was substantial evidence

14

supporting the trial court's decision because the business's owner also presented "a great deal of evidence," and there was no showing by the city to distinguish complaints about Goat Hill Tavern from other possible causes, including another bar next door. (*Goat Hill Tavern v. City of Costa Mesa, supra,* 6 Cal.App.4th at p. 1531.) The owner's evidence in *Goat Hill* included: (1) a petition signed by about 1,035 persons, supporting CUP renewal; (2) numerous letters from residents, area businesses, and civic and charitable groups supporting CUP renewal; and (3) declarations from its janitorial company indicating the bar had expanded its cleanup area. (*Id.* at p. 1524.) Goat Hill also presented evidence that the complaints were caused by homeless persons who congregated in a nearby parking lot, or by another bar directly adjacent to Goat Hill. (*Ibid.*) Finally, Goat Hill submitted police reports of incidents at all "similar establishments," and over half of those had a higher number of incidents during the same timeframe. (*Id.* at pp. 1524-1525.)

In contrast, the slight evidence submitted on behalf of T/Zers did not serve to rebut the evidence supporting the revocations and the demonstrated pattern of violence at T/Zers, including homicide, attempted murder, and assault and battery, or to show that multiple safety violations had been fixed. Opinions that T/Zers was "cleaner" or "safer" were inadequate. T/Zers was also unable to point to another cause than its own operations. Furthermore, unlike *Goat Hill*, where over half of all other similar businesses had more incidents during the same timeframe, not a single "similar" business had more calls for service than T/Zers. The severity of the calls, involving major crimes, was also

15

a significant factor.  This case is distinguishable from *Goat Hill*, both in the quantity and quality of evidence.  As the trial court recognized, the findings of the planning commission and the City are adequate.  (*Topanga Assn. for a Scenic Community v. County of Los Angeles, supra,* 11 Cal.3d at p. 515; *Harris v. City of Costa Mesa* (1994) 25 Cal.App.4th 963, 971 [in addition to findings in the city council resolution, the court could look to transcripts of hearings, and oral remarks made at a public hearing, which was recorded and could be transcribed.].)  The writ reversing the revocations was improvidently granted.

V

DISPOSITION

We reverse the judgment granting the writ of mandate.  The CUP and the business license should have been continued to be revoked for the relevant time period between November 2013 and October 2014.  We order the parties to bear their own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


HOLLENHORST
Acting P. J.


MILLER
J.

16